**FILED**

**U.S. Bankruptcy Court**
**Central District of Illinois**

10/24/2025  4:14 PM

**Adrienne D. Atkins, Clerk**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS
In re: David Choate Hughes II, Debtor.
Case No. 25-70566
Chapter 11

## DEBTOR'S OBJECTION TO CREDITOR'S MOTION FOR EXTENSION OF TIME TO FILE COMPLAINT TO CHALLENGE DISCHARGEABILITY OF DEBT

The Debtor, David C. Hughes II ("Debtor"), hereby files this Objection to the "Creditor's Motion for Extension of Time to File Complaint to Challenge Dischargeability of Debt" (Docket No. 108) (the "Motion") filed by Michelle Seiler Tucker o/b/o Seiler Tucker Inc. ("Movant"). In support thereof, the Debtor states as follows:

INTRODUCTION

1.  Movant's Motion is procedurally and substantively improper. It seeks an extension to pursue a dischargeability complaint for a debt that is not an obligation of this individual Debtor but rather of a separate corporate entity. Movant, therefore, lacks standing to challenge the dischargeability of a debt in this personal bankruptcy, and her Motion should be denied.

LEGAL STANDARD

2.  Under Fed. R. Bankr. P. 4007(c), a complaint to determine the dischargeability of a debt under § 523(c) must be filed within sixty (60) days after the first date set for the meeting of creditors. Rule 9006(b)(3) expressly limits the Court's discretion to extend this deadline "only to the extent and under the conditions stated" in Rule 4007(c). The movant bears the burden of demonstrating "cause" for any extension. See *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993). Courts in this Circuit have emphasized that deadlines under Rule 4007(c) are to be strictly construed and may not be enlarged absent a clear showing of diligence and good cause. See *In re Kaehler*, 314 B.R. 887, 889 (Bankr. C.D. Ill. 2004) (strictly enforcing the Rule 4007(c) deadline and noting extensions are not granted lightly).

OBJECTION

3. The Motion is a Legal Nullity Filed by an Unauthorized Individual.
   The Motion must be denied because it was filed by Michelle Seiler Tucker, a non-attorney, on behalf of a corporate entity, Seiler Tucker Inc. It is a well-established principle of law that a corporation must be represented by licensed counsel in federal court and cannot appear through a non-attorney officer or agent. See *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *In re IFC Credit Corp.*, 663 F.3d 315, 317-18 (7th Cir. 2011) (applying this rule in bankruptcy proceedings). A motion filed by a non-attorney on behalf of a corporation is a legal nullity and must be stricken. Because the Motion was not filed by a party authorized to practice before this Court, it is void and should be denied.

4. The Motion Should Be Denied Due to Insufficient Service of Process.
   The Movant's Motion is procedurally defective and must be denied because the Debtor, David Hughes, was never properly served by email or mail, despite the certificate of service stating otherwise, with the Motion as required by Fed. R. Bankr. P. 7004 and 9014. Service of process is a fundamental prerequisite to this Court's consideration of a contested matter. The failure to effect proper service deprives the Court of personal jurisdiction over the Debtor concerning this Motion and constitutes an independent and sufficient ground for denial. See *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *In re Ladd*, 450 B.R. 836, 843 (Bankr. C.D. Ill. 2011) (failure to serve a contested matter pursuant to Rules 7004 and 9014 is a fundamental procedural defect).

5. Movant Lacks Standing as a Creditor of this Debtor. Standing is a threshold requirement for any party seeking to invoke a court's jurisdiction. To have standing to file a complaint under 11 U.S.C. § 523(c), a movant must be a "creditor" of the debtor. A "creditor" is defined by the Bankruptcy Code as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A "claim" is a "right to payment." 11 U.S.C. § 101(5)(A).

6. Movant's Motion fails to allege any facts demonstrating she holds a "claim" against David Hughes, the individual. Her Motion states the debt arises from a "breach of contract" (Motion, ¶ 3). It is the Debtor's position that any such contract was with a corporate entity, for which the Debtor is not personally liable. It is a fundamental principle of corporate law that a corporation is a legal entity distinct from its shareholders and officers. A claim against a corporation is not, by itself, a claim against its individual principals. Movant has not alleged any facts that would justify piercing the corporate veil

to impose personal liability on this Debtor. Consequently, she is not a "creditor" in this individual Chapter 11 case and lacks standing to seek an extension under Rule 4007(c).

7. Movant's Litigation Conduct Demonstrates Improper Forum Shopping. As demonstrated by **Exhibit A**, Movant has engaged in a clear pattern of forum shopping, having previously filed suit against the Debtor on these same purported claims in both Florida and Louisiana. After facing adverse rulings or procedural impediments in those jurisdictions, Movant has now turned to this Court as her latest forum. "Forum shopping 'is the practice of choosing a court in which the plaintiff believes he will receive the most favorable judgment or verdict.'" *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184, 1189 (7th Cir. 1993). This practice is disfavored as it wastes judicial resources, harasses the defendant, and undermines the fair and efficient administration of justice. Allowing Movant to use this Court's limited extension procedures to further this pattern would prejudice the Debtor and sanction an abuse of the judicial process.

8. The Purported Debt is a Corporate Asset, Not a Personal Obligation. The debt Movant seeks to challenge is not an obligation of this Debtor but is instead an asset of a separate corporate entity. As detailed in **Exhibit B**, an internal investigative report and the sworn declaration of corporate officer Adam Walker conclusively establish that the underlying claim is for legal malpractice suffered by the corporate debtor. This claim belongs to the corporation, not to David Hughes individually. This fact is further corroborated by **Exhibit C**, a filing from the Trustee in the corporate bankruptcy case, which explicitly identifies and administers this very legal malpractice claim as an asset of the *corporate* bankruptcy estate. The Movant is attempting to use this proceeding to pursue a claim that is not only corporate in nature but is already being addressed in its proper forum—the corporate bankruptcy case. Allowing her to do so would create chaos and conflict between two separate estates and would improperly impose corporate liabilities on an individual debtor.

9. Illinois law presumes corporate separateness and limits personal liability absent exceptional circumstances. *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991); *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 864 N.E.2d 927 (Ill. App. Ct. 1st Dist. 2007).

10. The Requested Extension Pertains to a Non-Existent Cause of Action. The deadline established by Fed. R. Bankr. P. 4007(c) applies to complaints "to determine the dischargeability of a debt under § 523(c)." The discharge a debtor receives under Chapter 11, pursuant to 11 U.S.C. § 1141(d), applies to the debtor's personal pre-confirmation debts. If the debt in question is an obligation of a separate corporation, it is not a debt of this bankruptcy estate and is therefore not subject to being discharged—or to a challenge of its dischargeability—in this proceeding. Movant is attempting to use a procedural mechanism in a personal bankruptcy to litigate a claim that belongs elsewhere.

11. Movant Fails to Allege "Good Cause" Against this Debtor. To obtain an extension under Rule 4007(c), the movant must demonstrate "cause." Cause requires a showing of good faith and a reasoned basis for the extension. See, generally, *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993) (discussing "cause" in the analogous context of Rule 4004). A movant must do more than state they are "investigating"; they must provide a substantive reason why they have been unable to determine the grounds for a complaint. Movant's Motion contains only vague and conclusory statements about investigating potential § 523 grounds (Motion, ¶ 4) but alleges no specific facts connecting David Hughes, individually, to fraud, embezzlement, or willful and malicious injury. Her reference to a Trustee's objection in a separate corporate bankruptcy (Motion, ¶ 5) is irrelevant to establishing a personal liability of this Debtor. Conclusory allegations are insufficient to demonstrate good cause.

12. Moreover, Movant's assertion that the Debtor would "not be prejudiced" overlooks the burden and uncertainty imposed by perpetuating an unfounded claim. Granting an extension under these circumstances would prejudice the Debtor by prolonging baseless litigation over a debt that is not his personal obligation.

13. Because the Movant has not met her burden to demonstrate cause or establish creditor standing, her request must be denied.

PRAYER FOR RELIEF

WHEREFORE, the Debtor, David C. Hughes II, respectfully prays that this Honorable Court enter an order:
a. Striking the Creditor's Motion for Extension of Time (Docket No. 108) as a legal nullity filed by a non-attorney on behalf of a corporate entity;
b. In the alternative, Sustaining this Objection;
c. Denying Movant's Motion for Extension of Time (Docket No. 108); and
d. Granting the Debtor such other and further relief as the Court deems just and proper


Dated: 10-24-2025
Respectfully submitted,

David C. Hughes II

<u>Certificate of Service</u>

I hereby certify that all defendants have been duly served a copy of the following documents by U.S. Mail and/or email.

**EXHIBIT LIST**

The Debtor, David Choate Hughes II ("Debtor"), submits this list of exhibits to be relied upon in support of his Objection to the Creditor's Motion for Extension of Time (Docket No. 108).

| Exhibit | Description | Summary / Relevance |
|---|---|---|
| **Exhibit A** | Pleadings and Orders from Florida and Louisiana Proceedings (e.g., Complaints, Motions to Dismiss, Transfer Orders, Notices of Voluntary Dismissal) | This collection demonstrates the Movant's pattern of forum shopping. It will show that the Movant first sued the Debtor personally in Florida, then in Louisiana, and now seeks to litigate the same corporate dispute in this Illinois bankruptcy, each time after encountering jurisdictional or procedural hurdles. This conduct is prejudicial and undermines the integrity of the judicial process. |
| **Exhibit B** | Corporate Debtor's Evidence of Legal Malpractice Claim (Including: 1. Internal Investigative Report; 2. Declaration of Adam Walker) | This combined exhibit contains the Internal Report and the sworn Declaration of Adam Walker, which together detail the legal malpractice and other actions suffered by the corporate entity. This evidence conclusively shows that the claim for malpractice is a corporate asset, not a personal debt of David Hughes. It supports the core argument that the Movant is attempting to litigate a claim that belongs to the corporate bankruptcy estate. |
| **Exhibit C** | Trustee's Filing from the Florida Corporate Bankruptcy (e.g., Trustee's Report, Motion, or Objection referencing the malpractice claim) | This filing from the Trustee in the separate corporate bankruptcy case confirms that the legal malpractice claim is recognized as an asset of the *corporate* bankruptcy estate. It directly rebuts the Movant's implication that the debt is personal to David Hughes and proves the claim is being administered in the correct forum—the corporate case. |

# EXHIBIT A

 **Query** **Reports** ⌄ **Utilities** ⌄ **Help** **Log Out**

# Middle District of Florida
# Claims Register

### 3:24-bk-00496-BAJ Genie Investments NV Inc. Converted 08/12/2024

**Judge:** Jason A. Burgess    **Chapter:** 7
**Office:** Jacksonville      **Last Date to file claims:** 12/12/2024
**Trustee:** Aaron R. Cohen   **Last Date to file (Govt):**

*Creditor:*    (30864307)
Seiler Tucker Inc
400 Poydras Suite 1460
New Orleans, LA 70130

Amount claimed: $0.00

**Claim No: 52**
*Original Filed Date*: 07/01/2024
*Original Entered Date*: 07/01/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:*

## History:

Details    52-1    07/01/2024  Claim #52 filed by Seiler Tucker Inc, Amount claimed: $0.00 (Auto-Claim Filer)

## Description:

*Remarks:* (52-1) Filer Comment: The principal claims is $375000.00. Creditor is also entitled to unknown interest costs attorney fees and damages.

 Query  Reports ▾  Utilities ▾  Help  Log Out

CLOSED

# U.S. District Court
## Eastern District of Louisiana (New Orleans)
### CIVIL DOCKET FOR CASE #: 2:23-cv-07288-LMA-MBN

Seiler Tucker Inc. v. Genie Investments
Assigned to: Judge Lance M Africk
Referred to: Magistrate Judge Michael North
Demand: $375,000
Cause: 28:1332 Diversity-Other Contract

Date Filed: 12/13/2023
Date Terminated: 03/25/2025
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Seiler Tucker Inc.**

represented by **Gregory D. Latham**
Intellectual Property Consulting, L.L.C.
400 Poydras
Suite 1400
70130
New Orleans, LA 70130
504-322-7166
Fax: 504-322-7166
Email: glatham@iplawconsulting.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Vincent Vickers**
Intellectual Property Consulting, LLC
400 Poydras Street
Ste 1400
New Orleans, LA 70130
504-322-7166
Email: avickers@iplawconsulting.com
*ATTORNEY TO BE NOTICED*

**Kristen L. Burge**
IP Law Consulting, LLC
400 Poydras Street
Suite 1400
New Orleans, LA 70130
425-681-9587
Email: kburge@iplawconsulting.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Genie Investments**

**Defendant**

**Genie Investments II, LLC**

represented by **Genie Investments II, LLC**
c/o Phyllis Cropper
908 East 17th Street
Wilmington, DE 19802
PRO SE

**Movant**

**John Michael Cohan**

represented by **John Michael Cohan**
P.O. Box 6693
Jacksonville, FL 32236
Email: iustusprocessus@outlook.com
PRO SE

**Movant**

**David Hughes**

represented by **David Hughes**
2812 Pat Tillman Drive
Springfield, IL 62711
217-416-5059
PRO SE

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:

Case No.: 3:24-bk-00496-BAJ

GENIE INVESTMENTS NV, INC.

Chapter 11

Debtor.

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1. I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2. I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3. In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4. As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5. I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6. Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7. On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.  SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.  SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

Adam B. Walker
WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

5

 **Outlook**

## Rough draft -- opposition to US Trustee's 2d motion

**From** Adam Walker <adam@awsecuritieslaw.com>

**Date** Fri 7/19/2024 6:09 PM

**To** David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments <jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)

Opp UST's 2d Motion Appt Trustee.docx;

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief,
including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a
fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and
invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-
17. The UST based these allegations solely on the statements of 18 small-business owners. Following a
hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently
selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report.
According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations.
Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST
than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical
eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported
conclusions, and omissions of material and pertinent evidence. Among other things, the Report
inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie
required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due
Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an
upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision
to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any
reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history,
revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]   Doc. 146.

[2]   Report ¶ __. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence
Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]   Report ¶ __. This never happened. Any borrower who paid fees of any kind to McMann did not have a
BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement..."[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

### 1. The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

4      Second Motion, at 2.

5      Report ¶¶ 81, 39, 82.

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]   *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]   Second Mot., at 5-6 (¶ 11) (emphases added).

[8]   The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]   Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]     BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7th Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

## 2. *The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.*

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring… private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…"[12]

---

[11]     Report ¶ 83.

[12]     Second Mot., at 2.

### 3. The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement.

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof ad, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]   Second Mot. ¶ 16.

[14]   Second Mot. ¶ 17.

[15]   Second Mot. ¶ 19.

[16]   Second Mot. ¶ 19.

[17]   Second Mot. ¶ 19.

The UST does not even bother to cite the Report or any other evidence for these claims. That alone should doom the Motion, as unsupported, conclusory statements cannot establish fraud. But because the UST also urges the Court to find that the loans to affiliates constituted "gross mismanagement," a proper analysis of the factors referenced in the motion is warranted.

### The timing of Genie's transfers to affiliates does not support a finding of constructive fraud.

The UST asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans…"[18] This is flatly and blatantly false, and it reveals the UST's unwillingness to grapple with inconvenient facts.

The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

The Report provides details about each of these transfers, which happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023.[19] What these schedules show is that Genie's transfers to affiliated entities generally took place before Genie was insolvent or had any reason to believe that it would become insolvent, and before any putative creditor had sued Genie or threatened suit against it.[20]

With respect to Genie's transfers to its affiliate, Zoomeral, Inc., the Report shows that the net total transferred by Genie to Zoomeral in that period – through roughly 60 separate transactions – was $1,771,555.74. Of these transactions, 14 occurred before Genie entered the joint venture with Velanos.

---

[18]     Second Mot. ¶ 19.

[19]     Report, Exh. 4 (showing approximately 60 separate transfers from Genie to Zoomeral, Inc., between September 12, 2022, and July 28, 2023); Report ¶¶ 147, 159 (showing more than 25 transfers apiece from Genie to Capitulum Homes and Cald Holdings between September 2022 and July 2023).

[20]     Genie received its first threat of legal action regarding an ICA Payment refund in [October?] 2023.

Another 20 occurred before Velanos was late making any payments due under the Joint Venture Agreement.

Further, as discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement. Considering that the vast majority of the affiliate transfers at issue occurred before that time, the evidence clearly shows that few, if any, of those transfers occurred when Genie was insolvent or had reason to believe it would soon become insolvent.

### Genie received reasonably equivalent value for the affiliate transfers

The UST alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans."[21] By "non-market nature," the UST refers to the low interest rate, the absence of personal guarantees, the absence of a periodic-payment requirement, and the borrowers' option to extend the loan term for 10 years. The UST bases its allegation that the terms of these loans would not have been available to Genie's affiliates in the open market on the Report. For its part, the Report is devoid of any evidence regarding the terms that might have been available to the affiliate borrowers.

The UST fails to note that each of the loans at issue requires repayment in full of the loan's principal amount. The loans are not forgivable. Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers would likely have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily

---

[21]       Second Motion ¶ 19.

reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner.

Zoomeral, Inc., was the affiliate that received the largest amount of loans from Genie. Zoomeral built and operated the software platform that Genie and its borrowers used for communication, record management, and _____. In 2022-23, the Zoomeral platform was an integral part of Genie's business, and both Genie and Zoomeral expected that improvements to Zoomeral's systems would benefit both companies. Genie loaned money to Zoomeral so that it could hire developers to improve the software platform, establish a relationship with one or more payment processors, and create a marketing campaign to attract more potential borrowers. Genie reasonably expected its loan to Zoomeral to result in more business for Genie.

Better Methods

Capitulum

Cald

Case law research:

- "All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing." In re Tyler, 18 B.R. 574, 577 (S.D. Fla. 1982)

- Standard of proof: clear and convincing evidence that appointment of trustee is warranted

- Strong presumption that DIP shall remain in control of its business while in bankruptcy

- Court must "weigh the benefits that would be derived by the appointment of a Trustee against the expense of the appointment." *General Oil Distributors,* 42 Bankr. 402, at 409 (Bankr. E.D. N.Y. 1984).

- As a general rule. . . . a trustee will not be appointed where affiliate transactions are called into question, unless the movant can demonstrate that the transactions were improper, detrimental to the debtor estate, or were actually fraudulent." Norton Bankruptcy Law & Practice § 53.04; *See also General Oil Distributors,* supra, 42 Bankr. at 402; *All Sun Juices,* 34 Bankr. 162 (Bankr. M.D. Fla. 1983).

- Bankruptcy Court order appointing a trustee constitutes a final order that is immediately appealable to 11th Circuit

- "…it now appears the appointment of a trustee, saddling the estate with the expense of a appointed trustee and additional counsel, and the removal of the Garbaczes from management may well seriously handicap the Debtor's efforts to maintain its customer base and operating income." *In re Waterworks, Inc.,* 538 B.R. 445, 465-66 (Bankr. N.D. Ill. 2015)

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV INC.,                     Case No.: 3:24-bk-00496-BAJ

              Debtor.                          Chapter 7

_____/

## TRUSTEE'S MOTION TO (I) COMPROMISE CLAIMS
## WITH CHRISTOPHER D. WARREN, P.C., WARREN LAW
## GROUP, PLLC, AND SCOTT OH AND (II) ENJOIN CERTAIN CLAIMS

---

### NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING

If you object to the relief requested in this paper you must file a response with the Clerk of Court at 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202 within twenty-one (21) days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.

---

Aaron R. Cohen, Chapter 7 Trustee, (the "Trustee"), by and through his undersigned counsel, moves the Court pursuant to Fed. R. Bankr. P. 9019 for an order approving the compromise of claims by and between the Trustee and Christopher D. Warren, P.C., a now-dissolved New York professional corporation previously d/b/a The Warren Law Group ("CDW PC"), Warren Law Group, PLLC, a now-dissolved New York professional service limited liability company ("WLG

PLLC" and collectively with CDW PC, referred to as "WLG"), and Scott Oh ("Oh") and enjoining certain claims against WLG and Oh.  In support thereof, the Trustee states as follows:

## I.      **Background**

1.      On February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief (Doc. 1) under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ (the "Bankruptcy Case").

2.      On August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate (Doc. 207).

3.      On its Schedule A/B, the Debtor listed a cause of action against WLG for legal malpractice as an asset of the estate.

4.      On or about October 14, 2022, WLG and Oh were retained by the Debtor to provide legal services in connection with a proposed joint venture between the Debtor and Velanos Principal Capital ("Velanos"). The Debtor lost $9 million of capital contributed to Velanos for the joint venture.

5.      The Trustee conducted due diligence on the Debtor's malpractice claim, including issuing a subpoena to WLG for all documents related to its representation of the Debtor. The Trustee and his counsel also interviewed the attorney the Debtor had retained prior to conversion to represent it in connection with the malpractice claim. The Trustee and his counsel also interviewed at least five other attorneys who specialize in legal malpractice cases and who practice in New York under whose laws the malpractice action would have to be brought.

83484795;1

6.     The Trustee also initiated settlement discussions with WLG and Oh and their malpractice carrier. The Trustee, WLG, and Oh entered into a Tolling Agreement effective April 2, 2025, to toll the statute of limitations on any claim that the Debtor may have had against WLG and Oh through September 30, 2025, while the parties discussed a settlement of the malpractice claim.

7.     On February 14, 2025, John Cohan and David Hughes, as "stakeholders" in the Debtor, filed a *pro se* complaint in the United States District Court, Case No. 3:25-cu-164-HES-MCR (the "District Court Action"), asserting claims, including legal malpractice, arising from Debtor's joint venture with Velanos, and naming as defendant Scarinci Hollenbeck, LLC based on an allegation that Scarinci Hollenbeck LLC is a "successor entity" to WLG and Oh.

8.     On March 4, 2025, the Bankruptcy Court issued an Interim Order on Motion to Enforce Automatic Stay (Doc. 318) staying the District Court Action.

9.     On September 30, 2025, the Bankruptcy Court issued its Order Granting Trustee's Motion to Enforce Automatic Stay and Denying With Prejudice Equity Holders' Motions for Sanctions (Doc. 432) (the "Stay Order") holding that the malpractice claim is an asset of the bankruptcy estate that only the Trustee has standing to bring.

10.     The Trustee, WLG, and Oh have now reached a settlement of the Debtor's malpractice claim.

## II.     Terms of Compromise

11.     The Trustee, WLG, and Oh (collectively, the "Parties") have agreed to a compromise of all known claims arising from or related to the Debtor's malpractice claim (the "Compromise") which is set forth in the Settlement Agreement attached hereto and incorporated

3

herein as **Exhibit A**. The Settlement Agreement contains the full Compromise but the primary terms are as follows:

  a.  WLG and Oh shall pay the Trustee the total sum of $435,000 (the "Settlement Payment") within twenty-one (21) days after the later to occur of (i) entry of a final non-appealable order granting this Motion and (ii) entry of an order of dismissal with prejudice of all claims asserted in the District Court Action becoming a final and non-appealable order; and

  b.  If WLG and Oh fail to timely make the Settlement Payment, then after ten (10) days written notice to WLG's and Oh's counsel and WLG's and Oh's failure to cure within that ten (10) day period, WLG and Oh agree that the Trustee may pursue the Debtor's claims against WLG and Oh.

12.    Because John Cohan and David Hughes have already sought to pursue WLG and Oh (as well as the law firm of Scarinci Hollenbeck LLC under an alleged "successor entity" theory in the District Court Action and others may possibly also try to assert claims that belong to the bankruptcy estate, WLG and Oh have required that the Compromise and any Order approving the Compromise reiterate the Bankruptcy Court's ruling in the Stay Order that the bankruptcy estate is the sole owner of the right to recover damages for the Debtor's legal malpractice claim from WLG and Oh. As part of the Compromise, WLG and Oh require that an order be entered in the form attached as **Exhibit B** providing a bar against third parties asserting claims against them for the Debtor's legal malpractice claim.

13.    In the event that this Court does not enter the order including the above language, which may be determined to be a potential "bar order", then the Compromise shall be without force and effect.

83484795;1

14.     The Settlement Payment shall be property of the bankruptcy estate and shall be free and clear of all liens, claims, and encumbrances, and distributed by the Trustee in accordance with 11 U.S.C. § 726.

### Trustee's Reasons for the Compromise

15.     The Trustee believes that the Compromise is in the best interests of the estate and its creditors due to the costs and time involved in pursuing the Debtor's claims against WLG and Oh.

16.     First, the terms of the Debtor's engagement agreement with WLG and Oh require that any claims against them first be mediated in a mediation administrated by the New York, New York branch of the Judicial Arbitration and Mediation Service ("JAMS"). The engagement agreement also provides that if the parties could not resolve the claim in mediation, the claim must be brought as an arbitration proceeding before the New York, New York branch of JAMS under the laws of the State of New York. Therefore, any litigation against WLG and Oh could not be brought as an adversary proceeding before the Bankruptcy Court but instead, would have to be brought as an arbitration before JAMS in New York.

17.     Since the claims against WLG and Oh would have to be brought in New York under New York law, the Trustee and his counsel interviewed five different attorneys who specialize in legal malpractice on the plaintiff's side and who practice in New York. The Trustee wanted to find an attorney who would take the case on a 100% contingent fee basis. However, none of the attorneys would agree to take the case fully on contingency. The New York attorneys the Trustee and his counsel interviewed estimated that the fees to litigate the case could be approximately $300,000 to $400,000.

18.    Each of the malpractice attorneys the Trustee and his counsel interviewed stated that the case against WLG and Oh would be a very difficult and expensive case to litigate. There is no "smoking gun" document proving that WLG and Oh committed malpractice. Instead, the case would depend entirely on the testimony of and credibility of John Cohan and David Hughes versus the testimony and credibility of Scott Oh and representatives of WLG.

19.    Finally, WLG's malpractice insurance policy has a limit of $1 million and is a "wasting" policy. Since CDW PC and WLG PLLC are now both dissolved and Scarinci Hollenbeck LLC is not a successor in interest to either dissolved company, there are no assets against which to collect a judgment against WLG except for the malpractice insurance policy. Oh is covered by WLG's malpractice policy and does not appear to have significant assets against which to collect a judgment against him.

## Standard of Review

20.    Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). The standard in this Circuit for approving a compromise or settlement is set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544 (11th Cir. 1990). The Eleventh Circuit explained that bankruptcy courts must consider the following factors in evaluating a proposed settlement:

> a.  The probability of success in the litigation;
> b.  The difficulties, if any, to be encountered in the matter of collection;
> c.  The complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> d.  The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 1549.

21.     The Trustee has considered each of the *Justice Oaks* factors and has concluded that the Compromise adequately balances the risks of litigation, eliminates the related expense and delay, and helps ensure that the Estate will realize $435,000.

22.     11 U.S.C. § 105(a) provides that, "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This Court has the inherent power under the Bankruptcy Code, including section 105(a), to issue any order necessary or appropriate to carry out the provisions of Title 11, including a bar order. *Munford v. Munford, Inc., (In re Munford)*, 97 F.3d 449, 454 (11th Cir. 1996) (finding bankruptcy court had authority under section 105(a) to enter order barring claims against certain defendants); *Apps v. Morrison (Superior Homes & Invs., LLC)*, 521 Fed. Appx. 895, 897 (11th Cir. 2013) (affirming bar order involving suit against third parties where cash and assets paid "would be exhausted by the non-Debtor Defendants' defense of state court cases;" and  noting that entry of the bar order by the bankruptcy court was "well within the bankruptcy court's power as a court sitting in equity").

23.     A critical component of the proposed Compromise between the Trustee and WLG and Oh is the entry of a bar order prohibiting anyone from asserting claims against them for the Debtor's legal malpractice claim. Bankruptcy courts have authority to enter bar orders "where such orders are integral to settlement." *Munford*, 97 F.3d at 455. The potential "bar order" in this case is integral to the Compromise.

24.     The Eleventh Circuit addressed bar orders in the context of an S.E.C. receivership proceeding in *Securities and Exchange Comm'n v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020) and explained that the consideration of a bar order is "a two-part inquiry.  The court must conclude that the bar order is essential. And it must decide that the bar order is fair and equitable, with an

eye toward its effect on the barred parties." The question in *Quiros* was the definition of "essential."  The court held that, "A bar order issued to facilitate a settlement is essential only if it is essential to resolving the settling parties' litigation.  If the parties would have still resolved their dispute without entry of the bar order, the order is not essential and the court should not enter it." *Id*. The Eleventh Circuit found that the bar order entered in that case was not essential to resolve the litigation because the parties' settlement agreement expressly stated that the settlement would go forward even if the bar order were not entered. Here, the proposed Order meets the requirements of *Quiros* because the Compromise is predicated upon entry of the Order.

25.    A sister bankruptcy court recently concluded that bankruptcy courts still have the authority to issue bar orders in furtherance of settlement of Chapter 7 claims after the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). *See In re Commercial Express, Inc.*, 670 B.R. 573 (Bankr. M.D. Fla. 2025). In *Commercial Express*, the Chapter 7 trustee reached a settlement with two of the Debtor's insurance companies. One insurance company settled by agreeing to "buy" its policy from the trustee and the other reached a monetary settlement with the trustee. Both companies requested entry of a bar order prohibiting any future claims against the insurance policies based on the same facts. The U.S. Trustee objected to the proposed settlements on the basis that bar orders were prohibited by *Purdue Pharma*. Judge Geyer performed a thorough analysis of *Purdue Pharma* and its effect on the Eleventh Circuit's decision in *Munford* and concluded that *Purdue Pharma* did not "implicitly" overrule *Munford* and that, even if it did, *Purdue* was so distinguishable from that case that it did not preclude the bar orders at issue. The court pointed out that under § 704(a) a trustee is directed to collect and reduce to money the property of the estate which works in tandem with § 105(a) which authorizes a bankruptcy court to issue any order necessary to carry out the provisions of the Bankruptcy Code.

26.     Here, the bar order is an integral part of the Compromise and WLG and Oh would not have agreed to the Compromise without it. Additionally, this Court has already held that the Debtor's malpractice claim is an asset of the bankruptcy estate and that only the Trustee has the authority to bring the malpractice claim. Therefore, no third party could bring a claim against WLG or Oh in any event and the requested bar order simply amplifies the Court's prior ruling in the Stay Order.

27.     Therefore, the Trustee, in exercising his business judgment, believes approval of the Compromise is in the best interest of the creditors and the bankruptcy estate.

WHEREFORE, Aaron R. Cohen, Chapter 7 Trustee, respectfully requests the Court enter an Order approving this Compromise substantially in the form attached as **Exhibit B** and granting such other and further relief as the Court deems just and proper.

Dated: October 9, 2025                    AKERMAN LLP

By:  /s/ *Raye C. Elliott*
Raye C. Elliott, Esq.
Florida Bar Number: 018732
Email: raye.elliott@akerman.com
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Phone:  (813) 223-7333
Fax:  (813) 223-2837

*Attorneys for Aaron R. Cohen, Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 9, 2025, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record and that a true and correct copy of the foregoing was sent by U.S. Mail, postage prepaid and properly addressed to all creditors who hold claims for which a proof of claim has been filed, creditors, if any, that are still permitted to file claims by reason of an extension granted pursuant to Fed. R. Bankr. P. 3001(c)(1) or (c)(2), and parties who have filed a request for notice pursuant to section (f) of Local Rule 2002-1, as listed on the attached matrix.

*/s/ Raye C. Elliott*
Attorney

Label Matrix for local noticing
113A-3
Case 3:24-bk-00496-BAJ
Middle District of Florida
Jacksonville
Thu Oct  9 15:51:33 EDT 2025

Corey D. Boddie
40 Exchange Place, Suite 1800
New York, NY 10005-2716

20Twenty Development LLC
494 N Emery Ave
Orem, UT 84057-3708

A Complete Home Inspection LLC
110 Velsco Lane
Port Sulphur, LA 70083-2362

ALV Capital LLC
c/o Strauss Law Group PLLC
264 South River Road, Box 552
Bedford, NH 03110-7058

AMRODDO HOLDINGS, LLC
625 WOODMONT AVE
BERKELEY, CA 94708-1233

Acres & Royalty LLC
P.O. Box 1087
Ruston, LA  71273-1087

Alere LLC
1530 E. Williams Field Rd 201
Gilbert, AZ 85295-1825

Another Chance Group Home Inc
54 N Vista Ave
Casa Grande, AZ 85122-3193

Anvil Construction Inc.
470 N Main St
Brigham City, UT  84302
Brigham City, UT 84302-1858

Archer Capital Investments
Attn: Michael Thompson
1448 W. Salmon Caddis Drive
Bluffdale, UT 84065-5122

Archer Capital Investments LLC / Michael Tho
1448 W. Salmon Caddis Dr.
1448 W. Salmon Caddis Dr.
Bluffdale, UT 84065-5122

Autonomous Drine Solutions LLC
dba Calaway Solutions
Attn: Garrett Calaway
7180 S Hudson Circle
Centennial, CO 80122-2553

Autonomous Drone Solutions DBA Calaway Solut
2121 Brittmoore 2200
Houston, TX 77043-2220

(p)BELLE MAISON REALTY  LLC
ATTN LEA MUSE
1133 E 83RD ST
171
CHICAGO IL 60619-6455

Bild Credit LLC
30 N Gould Street 30212
Sheridan, WY 82801-6317

Braces at Brick, PA - Dr John Young
900 Cedar Bridge Ave Ste B15
Brick, NJ 08723

Brian Bevan
282 East 300 South
SMITHFIELD, UT 84335-1636

Brooklyn Heights
307 N Lincoln Street
307 N Lincoln Street
Tallulah, LA 71282-4314

Bull & Bear Properties LLC
1140 E 87th Street
Chicago, IL 60619-7012

Business Live Global USA LLC
4538 Walnut Ridge Circle
4538 Walnut Ridge Circle
McDonald, PA 15057-1608

Charles Blake Stringer/Nutra-AcresLLC
149 South Shore Drive
Amarillo, TX 79118-8007

Cobb Utilities Inc.
191 Honeysuckle Circle NE.
Ranger, GA 30734-6792

Cool Beanz, LLC
143 West Fulton Street
Sanford, FL 32771-1218

Dajo Properties LLC
11360Chestnut Tree Rd
Honey Brook, PA 19344

Darnell Development
1118 N Chinowth
VISALIA, CA 93291-7896

Faith Investors Services LLC
1522 4th Ave
Asbury Park, NJ 07712-4962

Foster Group LLC
2539 N 300 E
Lehi, UT 84043-4403

Global Verse Holdings LLC
1709 Vintage Lane
Wylie, TX 75098-0816

Heliosun LLC DBA Odin
1600 S Litchfield Rd 230A
Goodyear, AZ 85338

Hospitality Growth Capital LLC
c/o Strauss Law Group PLLC
264 South River Road, Box 552
Bedford, NH 03110-7058

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Jimmy D Chambers, CPA
7200 Hwy 87 N
Orange, TX 77632-9275

Knut LLC
697 N 740 E
Lehi UT 84043-1300

Latent Lending, LLC
Latent Wealth Group, LLC
Mark Steiner
302 N. Abajo Peak Way, UT 84032

Legacy Land Developers LLC
1651 W 100th St
CHICAGO, IL 60643-2128

Limitless Investment Group, LLC
3855 south
500 West Unit B
Salt Lake City, UT 84115

Log Cabin Building LLC
289 Parker Drive
Pittsburgh, PA 15216-1346

MIMS-IPR, LLC
1627 7th St S
Clanton, AL 35045-8786

McMann Commercial Lending LLC
c/o David E. Cohen
SWK Attorneys at Law
500 Skokie Blvd., Ste 600
Northbrook, IL 60062-2831

Meetopolis LLC
Attn: Lisa Butkiewicz
5434 E Kathleen Road
Scottsdale, AZ 85254-1759

Michael Calvitto, H&M Essential Services LLC
15714 Torry Pines Rd.
Houston, TX 77062-4512

Michael Thompson
1448 W Salmon Caddis Dr
Bluffdale, UT 84065-5122

Moser Holdings, LLC
537 S. 150 E.
Smithfield, UT 84335-1654

N2N Group, Inc
5 Webb Hill Road
Great Neck, NY 11020
Attention: Michelle Chen
Great Neck, NY 11020-1118

NCR Digital Corp
237 Floyd Road
Shirley, NY 11967-2941

New Mount Olive Church
2905 Macfarlane Crescent
2905 Macfarlane Crescent
Flossmoor, IL 60422-1427

North Haven Lodging Partners LLC
Benjamin J. Morris, c/o Foley & Lardner
11988 El Camino Real, Suite 400
San Diego, CA 92130-2594

North Haven Lodging Partners, LLC
Attn: Benjamin Morris, Esq.
Foley & Lardner LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130-2594

Nortical Capital Inc
921 E. Parker Street 1
Lakeland, FL 33801-1901

Nutre Leasing LLC
c/o Strauss Law Group PLLC
264 South River Road, Box 552
c/o Strauss Law Group PLLC, 264 South Ri
Bedford, NH 03110-7058

Office of the United States Trustee
400 West Washington Street
Suite 1100
Orlando, FL 32801-2440

Onsite lifecare Inc
23 dora lane
Holmdel, NJ 07733-1624

Relco Industries LLC and Richard L Ellison
75 Lambert Avenue
Clifton, NJ 07013-1254

Rolling By The Dozen RV Park LLC
40 Country Road 267
Somerville, TX 77879-5208

Rowehl & Russo Properties LLC.
237 Floyd Rd
Shirley, NY 11967-2941

S&L Zeppeteli DBA SLZ Waste Inc
191 Moonachie Road
Moonachie, NJ 07074-1309

Seiler Tucker Inc
400 Poydras Suite 1460
New Orleans, LA 70130-3260

Solace Realty Concepts LLC
112 Lehigh Ave
Newark, NJ 07112-2036

Solar Capital Funding LLC
c/o Strauss Law Group PLLC
264 South River Road, Box 552
c/o Strauss Law Group PLLC, 264 South Ri
Bedford, NH 03110-7058

Springer Farms Landholdings, LLC
325 N 1200 E
American Fork, UT 84003-2049

Sun Sport Entertainment Live LLC
6960 Brescia Way
Orlando, FL 32819-5288

Sunlight Storage LLC
3344 Bear Canyon Ln
Pleasant Grove, UT 84062-8016

Susan Ray
4314 Argentina Circle
4314 Argentina Circle
Pasadena, TX 77504-2502

Temidayo Adebayo
148 Undercliff Avenue
Suite 9
Edgewater, NJ 07020-1123

The Farming Co Pty Ltd
86 Lakeside Drive
Helena Valley
6056, Western Australia

The Generations Group-DonStrickland
14312 Zion Gate Xing
Conroe, TX 77384-2516

TnC NOLA Holdings LLC
1461 Annunciaction Street B
New Orleans, LA 70130-4539

Uncle Willie Green Wings
141 Lehigh Ave
Newark, NJ 07112-2037

WAI Holdings, LLC
1275 S Lucerne Blvd
Los Angeles, California 90019
Attention: David Meiselman
Los Angeles, CA 90019-6804

Wallingford Lodging Partners LLC
Benjamin J. Morris, c/o Foley & Lardner
11988 El Camino Real, Suite 400
San Diego, CA 92130-2594

West Palm Holdings Inc
2705 Via Vistosa
San Clemente, CA 92672-3636

Zelco Properties LLC
108 Patriot Dr A
Middletown, DE 19709-8803

Aaron R. Cohen +
P.O. Box 4218
Jacksonville, FL 32201-4218

Raye Curry Elliott +
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602-5250

Ryan E Davis +
Winderweedle Haines Ward & Woodman P.A.
329 Park Avenue North, Second Floor
Winter Park, FL 32789-7421

Bryan K. Mickler +
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211-6860

United States Trustee - JAX 11 +
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801-2210

Edward M Fitzgerald +
Holland & Knight LLP
200 South Orange Ave
Suite 2600
Orlando, FL 32801-3453

Max R Tarbox +
Tarbox Law PC
2301 Broadway
Lubbock, TX 79401-2916

Scott E Bomkamp +
DOJ-Ust
United States Trustee
400 W. Washington St.
Ste 1100
Orlando, FL 32801-2440

Note: Entries with a '+' at the end of the
name have an email address on file in CMECF

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Belle Maison Realty, LLC
Attn: Lea Muse
1133 E 83rd Street 171
Chicago, IL 60619

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Adam B. Walker                          End of Label Matrix
                                           Mailable recipients    81
                                           Bypassed recipients     1
                                           Total                  82

# Exhibit A

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (the "Agreement") is entered into as of the 6th day of September, 2025, by and between Aaron Cohen, Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Genie Investments NV, Inc. (the "Debtor"), Christopher D. Warren, P.C., a now-dissolved New York professional corporation previously d/b/a The Warren Law Group ("CDW PC"), Warren Law Group, PLLC, a now-dissolved New York professional service limited liability company ("WLG PLLC" and collectively with CDW PC, referred to as "WLG"), and Scott Oh ("Oh") (each a "Party" and collectively with the Trustee, the "Parties").

### Recitals

**WHEREAS,** on February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court"), in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ.

**WHEREAS,** on August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate.

**WHEREAS,** on or about October 14, 2022 WLG and Oh were retained by the Debtor to provide legal services in connection with a proposed joint venture between the Debtor and Velanos Principal Capital ("Velanos").

**WHEREAS,** the Debtor lost $9 million of capital contributed to Velanos for the joint venture.

**WHEREAS,** on its bankruptcy Schedule A/B the Debtor listed a cause of action against WLG for legal malpractice as an asset.

**WHEREAS,** on October 24, 2024, the Trustee issued a subpoena to WLG for all documents related to its representation of the Debtor.

**WHEREAS,** on February 14, 2025, John Cohan and David Hughes, as "stakeholders" in Debtor, filed a *pro se* complaint in the United States District Court, Case No. 3:25-cu-164-HES-MCR (the "District Court Action"), asserting claims, including legal malpractice, arising from Debtor's joint venture with Velanos, and naming as defendant Scarinci Hollenbeck, LLC based on an allegation that Scarinci Hollenbeck LLC is a "successor entity" to WLG and Oh;

**WHEREAS,** on motion by the Trustee, the Bankruptcy Court issued an order staying the District Court Action;

**WHEREAS,** the Parties entered into a Tolling Agreement effective April 2, 2025 to toll the statute of limitations on any claim that the Debtor may have had against WLG and Oh through September 30, 2025.

WHEREAS, WLG, Oh, and the Trustee have been engaged in settlement discussions.

WHEREAS, in the interest of avoiding costly and time-consuming litigation, the Parties have agreed to the terms set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including the mutual covenants and conditions set forth herein, the parties enter into the following Agreement:

### Terms and Conditions

1.     **Recitals.** The above recitals are incorporated herein and made a part hereof, and each Party acknowledges that the recitals are true and correct to the best of the Party's knowledge, information, and belief and each is a material inducement to enter into this Agreement. For purposes of this Agreement, WLG, Oh and their respective actual, purported or alleged successors, including, without limitation, Scarinci Hollenbeck, LLC, are referred to as the "Defendant Group."

2.     **Authority.** WLG, Oh, and the Trustee, are represented by counsel of their choice and knowingly and voluntarily enter into this Agreement and have full and complete authority to execute this Agreement.

3.     **Settlement of Trustee's Claims.** In full settlement of any and all claims the Debtor may hold against WLG and Oh, WLG and Oh shall pay the Trustee the total sum of $435,000.00 (the "Settlement Payment") within twenty-one (21) days after the later to occur of (i) entry of an order approving this Settlement Agreement (inclusive of the provision contemplated in Section 8 herein) by the Bankruptcy Court becoming a final and non-appealable order (the "Bankruptcy Court Final Order"); and (ii) entry of an order of dismissal with prejudice of all claims asserted in the District Court Action becoming a final and non-appealable order (the "District Court Final Order" and together with the Bankruptcy Court Final Order, the "Orders").

4.     **Default.** If WLG and Oh fail to timely make the Settlement Payment described in paragraph 3 above, then after ten (10) days written notice to them, through their attorney, of the default and their failure to cure within that ten (10) day period, the Trustee may pursue the Debtor's claims against WLG and Oh and this Agreement shall be null and void.

5.     **No Admission of Liability.** It is understood and agreed that this Agreement is the compromise of disputed claims, and that the terms of settlement contained herein and the releases executed are not intended to be and shall not be construed as admissions of any liability or responsibility whatsoever and WLG and OH expressly deny any liability or responsibility whatsoever. This Agreement shall not be admissible in any lawsuit, administrative action, or any judicial or administrative proceeding if offered to show, demonstrate, evidence, or support a contention that WLG or Oh acted illegally, improperly, or in breach of law, contract, or proper conduct.

6.     **Release.** Upon entry of the Orders and upon full payment of the Settlement Payment by WLG and Oh, and in consideration of the terms and conditions of this Agreement, except as otherwise set forth or contemplated herein, WLG and Oh, on one hand, and the Trustee, on another hand, do hereby release, and forever discharge each other, and the other members of

the Defendant Group, and all their respective past and present partners, members, associates, of counsels, principals, shareholders, directors, officers, law firms, attorneys, employees, agents, representatives, parents, subsidiaries, divisions, predecessors or successors in interest, heirs, executors, administrators, assigns, insurers, and reinsurers (collectively the "Defendant Releasees") from any and all claims and demands whatsoever, known and unknown, disputed and undisputed, suspected and unsuspected, including without limitation all actions and causes of action, debts, damages, punitive damages, liens, costs, expenses, attorneys' fees or court costs, which they ever had, now have, or which any personal representative, successor, heir or assign of said parties, hereafter can, shall or may have, against each other for, upon or by reason of any and all matters, from the beginning of the world to the day of this Release, including, but not limited to, all claims which could be asserted by the Debtor or, the Trustee on behalf of the Debtor, as against any of the Defendant Releasees. Nothing contained herein, however, shall release the Parties from the requirements of this Agreement.

7.    **Bankruptcy Court Approval.** The terms of this Agreement will be embodied in a motion to approve compromise in a form acceptable to all Parties that will be filed by the Trustee in the Bankruptcy Case.

8.    **ORDER REGARDING NON-DEBTOR CLAIMS. AS A CONDITION TO AND INTEGRAL TO WLG'S AND OH'S MAKING THE SETTLEMENT PAYMENT AND TO THIS SETTLEMENT AGREEMENT BECOMING EFFECTIVE, ANY ORDER APPROVING THIS AGREEMENT MUST INCLUDE A PROVISION STATING THAT THE RIGHT TO PURSUE ANY CLAIMS HELD BY THE DEBTOR AGAINST ANY OF THE DEFENDANT RELEASEES ARE SOLELY OWNED BY THE BANKRUPTCY ESTATE AND NO NON-DEBTOR PARTY (INCLUDING, BUT NOT LIMITED TO, JOHN MICHAEL COHAN AND DAVID HUGHES), HAS THE RIGHT TO ASSERT A CLAIM OR MAINTAIN ANY EXISTING CLAIMS AGAINST ANY OF THE DEFENDANT RELEASEES ARISING OUT OF OR RELATED TO WLG'S AND OH'S REPRESENTATION OF THE DEBTOR, INCLUDING, BUT NOT LIMITED TO, THE DISTRICT COURT ACTION.**

9.    **Dismissal of District Court Action; Inability to Obtain Approval.**

a.    The Parties agree to file a joint motion in the District Court Action presenting to the District Court the Bankruptcy Court Final Order and seeking from the District Court issuance of the District Court Final Order.

b.    If the Trustee is unable to obtain either of the Orders, then this Agreement shall be of no force and effect and the Trustee may proceed with prosecution of his claims against WLG and Oh.

10.    **Tolling of Statute of Limitations.** The Parties stipulate and agree that the statute of limitations for all claims held by the Trustee on behalf of the Debtor against WLG and Oh will be tolled until such time as the order approving this Agreement becomes a final and non-appealable order or the Trustee provides notice to WLG and Oh that he is unable to obtain a final and non-appealable order approving this Agreement. In other words, in the event that the Trustee is unable to obtain a final and non-appealable order approving this Agreement, the period of time

commencing with the execution of this Agreement to the date that the Trustee provides notice to WLG and Oh that he is unable to obtain a final and non-appealable order shall be added to the applicable statute of limitations.

11. **Governing Law/Stipulated Jurisdiction.** This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Florida applicable to contracts made and to be performed fully within the State of Florida. The Parties consent to the jurisdiction of the Bankruptcy Court for any all disputes arising out of or resulting from this Agreement.

12. **Counterparts.** This Agreement may be executed in counterparts, each of which shall constitute an original but all of which taken together shall constitute one and the same document.

13. **Notices Pursuant to the Agreement.** Any written notices under this agreement shall be delivered by email and overnight courier, sent to counsel to the relevant Party as well as the relevant Party. Raye Elliott shall be counsel for Trustee and notice may be delivered to said counsel by email to raye.elliott@akerman.com. Brett Scher shall be counsel for WLG and Oh and notice may be delivered to said counsel by email at bscher@kaufmandolowich.com.

14. **Successors and Assigns.** This Agreement as well as the order contemplated herein, shall be binding upon, and inure to the benefit of the Parties and their respective successors and assigns, including the Defendant Group.

15. **Modification.** This Agreement, and any of the covenants, conditions and representations contained herein may not be waived, changed, altered or modified except by an instrument in writing signed by the Party against whom enforcement of such change is sought.

16. **Interpretation.** The Parties each acknowledge that each has contributed substantially and materially to the negotiation and preparation of this Agreement, and it shall be deemed the joint work product of all parties and their respective counsel and all Parties shall be considered the drafters of this Agreement. As such, this Agreement shall not be construed more strictly against one party than against another merely by virtue of the fact that it may have been prepared by counsel to one of the Parties. Each of the Parties declares that they have been represented by counsel in connection with the negotiation of this Agreement or have had the opportunity and wherewithal to be represented by counsel in the review, negotiation, and execution of this Agreement, and that the terms and conditions of this Agreement are understood fully and agreed to voluntarily. Headings used in this Agreement are for the convenience of the Parties solely and have no substantive intent or purpose.

/

/

/

/

IN WITNESS WHEREOF, the Parties intending to be legally bound, have duly executed and delivered this Agreement as of the Effective Date.


Aaron Cohen as Trustee of the
bankruptcy estate of Genie Investments
NV, Inc.

CHRISTOPHER D. WARREN, P.C.

By: _____
    Christopher Warren
Its: President


Scott Oh

WARREN LAW GROUP, PLLC

By: _____
    Christopher Warren
Its: Managing Member

# Exhibit B

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV INC.,                    Case No.: 3:24-bk-00496-BAJ

        Debtor.                                    Chapter 7

_____/

### ORDER GRANTING TRUSTEE'S MOTION TO (I) COMPROMISE CLAIMS WITH CHRISTOPHER D. WARREN, P.C., WARREN LAW GROUP, PLLC, AND SCOTT OH AND (II) ENJOIN CERTAIN CLAIMS

THIS CASE came before the Court upon the Motion (the "Motion") (Doc. ___)[1] of Aaron R. Cohen, as Chapter 7 Trustee for the bankruptcy estate of Debtor, Genie Investments NV Inc., to (I) Approve Compromise with Christopher D. Warren, P.C., Warren Law Group, PLLC, and Scott Oh, and (II) Enjoin Certain Claims. There being no objection to the Motion after proper notice to interested parties pursuant to Local Bankruptcy Rule 2002-4 on October ____, 2025, it is

**ORDERED**:

1.      The Motion is granted.

2.      The Compromise is approved and is fully enforceable in all respects.

---

[1] Defined terms from the Motion are incorporated by reference herein.

3.      The Court finds that a bar order is a mandatory condition of the Compromise and that, without the bar order, the Compromise will not be consummated and that entry of a bar order is necessary and appropriate in order to achieve the payment to the bankruptcy estate contemplated by the Compromise, and that its entry is an appropriate exercise of the Court's sound discretion to facilitate settlements and promote the consensual resolution of disputes.

**4.      Therefore, the right to pursue any claims held by the Debtor against Christopher D. Warren, P.C., Warren Law Group, PLLC, and Scott Oh (as well as any purported successors in interest) are solely owned by the bankruptcy estate and all non-debtor parties are enjoined from asserting a claim against Christopher D. Warren, P.C., Warren Law Group, PLLC, and Scott Oh arising out of or related to their representation of the Debtor, included, but not limited to, the District Court Action.**

Attorney Raye C. Elliott is directed to serve a copy of this order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

83420870;2

Michelle Seiler Tucker
obo Seiler Tucker Inc.
400 Poydras Street, Ste. 1460
New Orleans, LA 70130
michelle@seilertucker.com

DOJ-UST
James Anthony Salinas
401 Main St.
Ste 1100
Peoria, IL 61602
309-671-7854
Email: james.salinas@usdoj.gov


Interested Party
John Michael Cohan
PO Box 6693
Jacksonville, Florida 32236
iustusprocessus@outlook.com

Debtor
David C. Hughes II
2812 Pat Tilman Drive
Springfield, Illinois 67211
davidchoatehughes@gmail.com