FILED TIME PM1:04
2026 JUL 31 SPR

ADRIENNE D. ATKINS
CLERK, USBC CDIL

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE:<br>**DAVID CHOATE HUGHES II**<br><br>Debtor. | ) In Proceedings<br>) Under Chapter 7<br>)<br>) **BK 25-70566**<br>)<br>) |

**CLAIMANT LEA MUSE'S RESPONSE IN OPPOSITION TO TRUSTEE'S OBJECTION TO CLAIM NO. 26-1 (DOC. 434), REQUEST FOR EVIDENTIARY HEARING, AND ALTERNATIVE REQUEST FOR LEAVE TO AMEND**

Lea Muse ("Claimant"), appearing pro se, respectfully submits this Response in opposition to the Trustee's Objection to Claim No. 26-1 and states as follows:

## I. INTRODUCTION

1. The Trustee seeks complete disallowance of Claim No. 26-1, filed in the amount of $3,070,000.

2. The Trustee states three grounds for the Objection:

   a. The Claim appears to concern a debt of Genie Investments NV, Inc. ("Genie") rather than David Choate Hughes II ("Hughes" or "Debtor") individually;

   b. The Claim appears duplicative of the claim filed by Belle Maison Realty, LLC in Genie's Florida bankruptcy; and

   c. The Claim asserts damages based upon fraudulent inducement, false pretenses, misrepresentation, concealment, reliance, unjust enrichment, misuse of funds, consequential damages, lost opportunity damages, and other damages that the Trustee contends should instead be asserted as an objection to dischargeability.

3. Claimant understands that she is responsible for supporting Claim No. 26-1 with facts and documents.

4. Claimant does not ask the Court to hold Hughes personally responsible merely because he held a title or ownership interest in Genie.

5. Claimant's position is that Hughes may be personally responsible because the available evidence shows his ownership, management, knowledge, participation, authorization, control, and possible personal benefit from the conduct and transactions that caused Claimant's loss.

6. Hughes was not a remote employee or passive investor.

7. Hughes was a fifty-percent owner of Genie, an officer during the relevant period, one of the limited number of principals operating the company, and a co-owner of Zoomeral, Inc. ("Zoomeral"), an affiliated company used in Genie's lending operation.

8. Hughes personally executed the purported loan agreement through which Genie transferred **substantial** funds to Zoomeral.

9. The Examiner's findings raise substantial questions concerning Hughes's personal participation in the collection, control, transfer, use, and failure to return borrower funds.

10. Those factual questions should not be resolved solely by stating that Claimant's agreements and payments involved a corporate entity.

1

11. The Trustee filed the present Objection on July 8, 2026.

12. Seven days later, on July 15, 2026, this Court entered a Default Judgment denying Hughes a discharge in this same bankruptcy case.

13. That later judgment materially affects the Trustee's third stated ground because, as the judgment currently stands, Hughes has been denied a discharge in this case.

14. The denial of Hughes's discharge does not establish the validity or amount of Claim No. 26-1. It does, however, remove the Trustee's stated procedural concern that Claimant's allegations must be pursued solely through an objection to dischargeability. Because Hughes has been denied a discharge in this case, the remaining issues are whether Hughes personally owes a debt to Claimant and, if so, the amount of that debt.

15. Claimant respectfully requests that the Court deny the Trustee's request for complete disallowance and permit Claimant to present supporting evidence at an evidentiary hearing.

## II. CLAIMANT'S UNDERLYING TRANSACTION AND LOSS

16. Claimant is the sole member of Belle Maison Realty, LLC ("Belle Maison").

17. Claimant personally participated in the financing transaction, personally signed the relevant documents, personally relied upon the promised financing, and personally provided funds used in connection with the transaction.

18. Claimant and Belle Maison sought approximately $3 million in business financing through a coordinated lending process involving McMann Commercial Lending, Genie, and related participants.

19. The proposed financing included a Business Expansion Line of Credit commonly referred to as the "BELOC."

20. The Bridge Loan Agreement involving Genie was presented as part of the process for satisfying the interest-reserve requirement connected to the larger BELOC transaction.

21. Claimant did not seek the bridge loan as an isolated transaction.

22. Claimant entered the bridge-loan arrangement because it was represented as part of the process necessary to obtain the larger promised financing.

23. Claimant would not have borrowed personal funds, paid the requested amounts, signed the related agreements, or placed herself and her business at financial risk without the representation that those steps would lead to funding.

24. A total of $70,000 was paid to Genie in connection with the transaction.

25. Genie's bank records reflect:

   a. A $25,000 payment from Lea Muse personally on or about January 30, 2023; and

   b. A $45,000 payment from Belle Maison on or about March 9, 2023.

26. The Chapter 7 Trustee in Genie's Florida bankruptcy reviewed Genie's bank records and confirmed that Genie received both payments.

27. The Florida Trustee further confirmed that Genie's records did not show that Genie ever funded a loan to Belle Maison.

28. The Florida Trustee acknowledged that the supporting records substantiated a claim of at least $70,000.

29. **Genie accepted the money, but the promised $3 million BELOC financing was never provided.**

30. **The $70,000 was <u>not</u> returned.**

31. The $3 million portion of Claim No. 26-1 is not presented as though Claimant transferred $3 million to Genie or Hughes.

32. It represents damages Claimant asserts resulted from the failed financing transaction and Hughes's alleged personal participation in the underlying conduct.

33. Those asserted damages include, to the extent established through documents and testimony:

   a. The loss of the represented financing opportunity;

   b. The loss of capital used to satisfy the conditions of the transaction;

   c. Personal debt incurred in reliance upon the promised funding;

   d. Financing costs and interest expenses;

   e. The loss of identifiable business opportunities;

   f. Damage to the business Claimant was attempting to establish and operate;

   g. Consequential financial injury; and

   h. Other damages supported by evidence.

34. Claimant recognizes that damages above the $70,000 actually paid require additional evidence and calculation.

35. Claimant therefore requests an evidentiary hearing or permission to submit a detailed damages schedule rather than complete disallowance of the Claim.

## III. THE EXAMINER'S FINDINGS CONNECT HUGHES PERSONALLY TO THE CONDUCT

36. The Court-appointed Examiner in Genie's Florida bankruptcy reviewed Genie's bankruptcy schedules, bank records, brokerage records, loan agreements, QuickBooks records, deposition transcripts, sworn testimony, public records, contracts, creditor affidavits, and communications with Genie's principals.

37. Claimant previously submitted the Examiner's Report as supporting documentation in this bankruptcy case in connection with filing of Proof of Claim No. 26-1. To avoid unnecessarily duplicating a lengthy report already contained in the record, Claimant relies upon and incorporates the relevant portions previously submitted. Claimant will provide separately marked copies of the relevant pages, together with any additional supporting documents, at an evidentiary hearing or at such other time as the Court may direct.

38. The Examiner identified Hughes as an officer of Genie during the period in which Genie conducted its lending operation and collected money from prospective borrowers.

39. Hughes informed the Examiner that Genie was formed to make business loans.

40. The Examiner reported that Hughes and John Michael Cohan each owned fifty percent of Genie.

41. The Examiner reported that Genie maintained an office in Florida but had no employees apart from its management.

42. The Examiner reported that referral agents, promoters, brokers, and related entities throughout the country connected prospective borrowers to Genie as a potential lender.

43. Zoomeral was one of the entities used to connect prospective borrowers with Genie.

44. The Examiner reported that Zoomeral was owned by Hughes and Cohan, the same individuals who each owned fifty percent of Genie.

45. The Examiner reported that **none** of Genie's customers had loans funded through the claimed Lender Capital Partners.

46. The Examiner attributed that information directly to Hughes and Cohan.

47. These facts raise a substantial question concerning what Hughes knew about Genie's actual ability to fund customer loans while Genie and its related participants continued collecting money from borrowers.

48. The Examiner also reported that Genie collected due-diligence fees, interest-reserve funds, and bridge-interest payments from customers who did not receive the represented financing.

49. The Examiner identified instances in which one borrower's termination refund was funded with another borrower's interest-reserve deposit.

50. The Examiner separately investigated the relationship and transfers between Genie and Zoomeral.

51. The Examiner reported that the purported Zoomeral loan was unsecured, non-recourse, carried an interest rate of only 0.1 percent per year, required one balloon payment in 2029, and permitted Zoomeral to request an extension for as long as ten additional years.

52. The Examiner concluded that the terms given to Zoomeral were extremely favorable to Zoomeral and far outside the ordinary course of what Zoomeral could have expected to receive from a standard lender.

53. Hughes personally executed the purported loan agreement on behalf of Zoomeral, while Cohan executed the agreement on behalf of Genie.

54. During the period from May 2022 through August 2023, Genie transferred approximately **$2,189,818 to Zoomeral**.

55. During that same period, Zoomeral transferred approximately $496,763 to Genie.

56. **Zoomeral therefore received approximately $1,693,055** more from Genie than it returned.

## IV. HUGHES CANNOT BE TREATED AS A STRANGER TO GENIE'S LENDING OPERATION

57. Claimant does not contend that ownership alone makes Hughes responsible for every debt of Genie. Rather, Claimant contends that Hughes's personal responsibility must be examined because, during Claimant's January through March 2023 transaction, Genie was operated by an extremely small management group and had no employees apart from its management. The Examiner reported that Michael Connor left Genie in approximately August or September 2022 and was no longer listed as an officer by February 8, 2023. Based upon that record, the remaining principals operating Genie during Claimant's transaction were Hughes, John Michael Cohan, and Caleb Davis.

58. Hughes was therefore not merely a passive owner removed from Genie's operations. He was a fifty-percent owner, an officer, and one of only three remaining principals through whom Genie conducted its business. Because Genie reportedly had no separate employees or operational staff, this limited management structure supports the reasonable inference that the receipt of borrower funds, communications concerning funding, management of company accounts, decisions regarding the use and transfer of funds, and continued operation of the lending program were handled, directed, or supervised by Genie's principals, including Hughes.

59. Claimant therefore contends that Hughes's responsibility arises not simply from his ownership interest, but from his active position within the limited group that operated Genie, together with the evidence that he jointly owned Zoomeral, personally executed the Zoomeral loan agreement, participated in discussions concerning Genie's business and funding sources, and was connected to substantial transfers of Genie funds to an entity he owned.

60. These circumstances support an evidentiary determination of what Hughes personally knew, authorized, directed, participated in, concealed, or benefited from. They also make it unreasonable to treat Hughes as a stranger to Genie's lending activities or to conclude, without further examination, that all responsibility belongs exclusively to the corporate entity.

61. The Examiner further reported that Genie's original Statement of Financial Affairs described approximately $1.9 million transferred to Zoomeral as:

> "Loan/Compensation to David Hughes as Director."

62. **Genie later amended** that description and characterized a smaller amount as an "insider corporation loan."

63. The original description is significant because Genie's own disclosure directly connected the transfer to Hughes personally.

64. The Examiner found no apparent repayment of the Zoomeral loans in the bank records reviewed.

65. The Examiner also reported that an additional Genie-related company jointly owned by Hughes and Cohan transferred approximately **$979,250 to Zoomeral** between January 2023 and April 2024.

66. The Examiner determined that the source of those funds included Genie's Morgan Stanley accounts and customer deposits.

67. These findings raise factual questions concerning:

   a. Hughes's knowledge of the source of Genie's funds;

   b. Hughes's knowledge of the purposes for which borrower funds were collected;

   c. Hughes's knowledge that Genie's claimed Lender Capital Partners had not funded customer loans;

   d. Hughes's participation in deciding where Genie's funds would be transferred;

   e. Hughes's execution of the Zoomeral transaction;

   f. Hughes's ownership interest in both Genie and Zoomeral;

   g. Any compensation, payment, personal expense, or other benefit Hughes received;

   h. Why the purported Zoomeral loans were not repaid;

   i. Whether customer funds were commingled with funds transferred to insiders or affiliated companies;

   j. Whether Hughes permitted the collection of additional borrower funds after the absence of a reliable funding source became known; and

   k. **Why Claimant's funds were not returned after the represented financing was not provided.**

68. These questions concern **Hughes's own conduct** and not merely conduct attributed to a corporation with which he happened to be associated.

69. The Trustee's first objection states that Claimant's loss appears to belong only to Genie because Genie received the payments and was involved in the agreements.

70. That position does not address Hughes's ownership, management, personal participation, execution of the Zoomeral agreement, or connection to insider transfers.

71. Claimant contends that the evidence supports further examination of whether Hughes personally:

   a. Participated in Genie's lending operation;

   b. Knew that Genie lacked a reliable source of funding;

   c. Authorized, approved, or permitted the continued collection of borrower funds;

   d. Controlled or participated in decisions concerning the use of those funds;

   e. Caused, approved, or benefited from transfers to Zoomeral;

   f. Concealed or failed to disclose material facts concerning Genie's inability to provide the represented financing;

   g. Permitted borrowers to continue relying upon representations of available funding; and

   **h. Failed to return funds after the promised financing was not provided.**

72. Claimant therefore requests a determination, solely for purposes of claim allowance, of whether Hughes's own knowledge, participation, authorization, concealment, control, or receipt of benefits created a debt owed directly to Claimant.

73. Claimant requests a factual determination of Hughes's personal responsibility for the civil debt asserted in Claim No. 26-1.

74. The Trustee's Objection does not address the Examiner's specific findings connecting Hughes to Genie, Zoomeral, and the transfer of Genie funds.

75. The Objection does **not** provide evidence that Hughes was uninvolved in Genie's lending operation.

76. The Objection does **not** provide evidence that Hughes lacked knowledge of Genie's funding problems.

77. The Objection does **not** provide an accounting of the money transferred to Zoomeral.

78. The Objection does **not** establish whether Hughes received compensation, personal benefits, or indirect benefits through Zoomeral.

79. The Objection states that the Claim "would appear" to belong to Genie, but the factual record requires more than an assumption based upon the corporate name appearing in the transaction documents.

80. Claimant respectfully submits that she has identified sufficient facts to require further examination before Claim No. 26-1 can be completely disallowed.

## V. THE CLAIMS FILED IN THE TWO BANKRUPTCIES ARE NOT AN ATTEMPT TO OBTAIN DOUBLE RECOVERY

81. Belle Maison filed a proof of claim in Genie's Florida bankruptcy because Genie received the payments and was directly involved in the underlying lending transaction.

82. The Florida Genie bankruptcy concerns the responsibility of Genie's corporate estate for funds received by Genie.

83. Claimant's position in the Florida case was narrowed for estate-distribution purposes to the approximately $70,000 actually paid to Genie.

84. Claimant did not seek a distribution of $3 million from Genie's bankruptcy estate merely because that was the amount of the promised financing.

85. Hughes is not the debtor in the Florida Genie bankruptcy.

86. Claim No. 26-1 was filed in Hughes's personal bankruptcy because the Examiner's findings and related evidence raise separate questions concerning Hughes's own conduct, knowledge, control, authorization, transfers, concealment, and personal benefit.

87. The Florida claim concerns Genie's responsibility for money received by the corporate debtor.

88. The present Claim concerns Hughes's potential personal responsibility arising from his own actions and participation.

89. Claimant expressly states that she does not seek double recovery.

90. Any amount actually recovered for the same injury from Genie's estate, Hughes's estate, Zoomeral, or another responsible party will be disclosed and credited against the corresponding unpaid loss.

91. Claimant has not received repayment of the $70,000.

92. Claimant has not recovered the additional damages asserted in Claim No. 26-1.

93. Filing claims against two separate debtors does not establish that Claimant has been paid twice or seeks to collect the same damages twice.

94. The existence of the Florida claim therefore does not establish that Hughes bears no individual responsibility.

95. At most, the existence of the two claims requires an appropriate credit for any actual recovery.

96. It does not require complete disallowance of the Claim against Hughes before his personal conduct is examined.

## VI. THE TRUSTEE'S DISCHARGEABILITY OBJECTION AND THE DENIAL OF HUGHES'S DISCHARGE IN THIS CASE

97. The Trustee's third basis for objecting to Claim No. 26-1 states:

> *"The Claim seeks damages based upon, inter alia, alleged 'fraudulent inducement, false pretenses, misrepresentation, concealment, reliance, unjust enrichment, misuse of funds, consequential damages, lost opportunity damages, and other damages to be determined' which claim is more properly asserted as an objection to dischargeability in Debtor's bankruptcy case."*

98. That stated basis was materially affected by an order entered after the Trustee filed the present Objection.

99. On July 15, 2026, this Court entered a Default Judgment denying Hughes a discharge in the present bankruptcy case, In re David Choate Hughes II, Case No. 25-70566, docketed in the main case as Document No. 468.

100. The judgment was entered in Adversary Proceeding No. 26-07013 upon the complaint of the Acting United States Trustee.

101. The judgment states that Hughes appeared pro se at the hearing but had not filed an answer to the complaint or a response to the United States Trustee's motion for default judgment.

7

102. Before entering the judgment, the Court reviewed the United States Trustee's motion, supporting affidavit, and underlying complaint.

103. The Court found that the complaint and motion were well pleaded in both the law and the facts.

104. The Court denied Hughes a discharge under 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), and 727(a)(4)(A).

105. The stated grounds included:

    a. False oaths;

    b. Concealment; and

    c. Failure to keep or preserve information.

106. Because Hughes has been denied a discharge in the present bankruptcy case, Claimant is not seeking through this Response to have Claim No. 26-1 separately excepted from discharge.

107. Claimant is therefore not asking the Court, through this Response, to enter a separate judgment declaring Claim No. 26-1 nondischargeable.

108. Claimant asks the Court to determine whether Hughes's own conduct created a debt owed directly to Claimant and whether Claimant is entitled to participate as a creditor in any distribution from Hughes's Chapter 7 estate.

109. The July 15, 2026 denial of discharge does not, by itself, establish the validity or amount of Claim No. 26-1.

110. Claimant does not rely upon the discharge judgment as independent proof that Hughes committed fraud against Claimant in the Genie transaction.

**111. The validity of Claim No. 26-1 remains based upon the evidence concerning:**

    a. Hughes's fifty-percent ownership of Genie;

    b. Hughes's position as an officer and one of only three principals operating Genie during Claimant's transaction;

    c. Genie's lack of employees apart from its management;

    d. Hughes's knowledge of Genie's represented lending operation and actual funding sources;

    e. The continued receipt of funds from borrowers who did not receive the represented financing;

    f. Hughes's joint ownership of Zoomeral with Cohan;

    g. Hughes's execution of the purported Zoomeral loan agreement;

    h. The substantial transfers from Genie to Zoomeral;

    i. The lack of apparent repayment of the remaining Zoomeral balance;

    j. The original description of approximately $1.9 million as "Loan/Compensation to David Hughes as Director"; and

    **k. The failure to return Claimant's funds after the promised financing was not provided.**

112. Nevertheless, the July 15, 2026 denial of discharge directly answers the Trustee's suggestion that Claimant's allegations must instead be pursued merely to prevent the debt from being discharged.

8

113. Because Hughes has been denied a discharge in this case, the issue is whether Claimant has an allowable debt against Hughes, not whether that debt must be separately excepted from discharge.

114. A possible dischargeability proceeding therefore no longer provides a reason to completely disallow Claim No. 26-1.

115. The Court should instead consider whether Hughes's personal knowledge, participation, authorization, concealment, control, or receipt of benefits created personal responsibility for Claimant's loss.

116. Claimant respectfully requests an evidentiary hearing at which the parties may present documents and testimony concerning Hughes's involvement in Genie, Zoomeral, the collection of borrower funds, and the disposition of those funds.

## VII. THE RECORD DOCUMENTS $70,000 PAID IN THE TRANSACTION, INCLUDING $25,000 PAID DIRECTLY BY CLAIMANT

117. Even if the Court determines that additional evidence is required to establish the entire $3,070,000 claimed amount, the existing record documents $70,000 paid to Genie in connection with the transaction, including $25,000 paid directly by Claimant individually.

118. Genie's bank records confirm that Genie received:

    a. $25,000 from Lea Muse personally; and

    b. $45,000 from Belle Maison.

119. **The promised $3 million BELOC financing was not provided.**

120. **The money was not returned.**

121. Genie's Florida Chapter 7 Trustee acknowledged that the supporting documents substantiated a claim for $70,000.

122. The Florida Trustee did not object to allowance of the $70,000 as a general unsecured claim against Genie's estate.

123. The present Trustee's Objection does not contend that the payments were never made.

124. The Objection does not contend that Claimant or Belle Maison received the promised financing.

125. The Objection does not contend that the $70,000 was refunded.

126. The Objection does not provide an accounting showing that Claimant's funds were used for the purpose represented.

127. The Objection also does not address the Examiner's findings concerning Hughes's ownership, operational role, Zoomeral ownership, execution of the Zoomeral agreement, or connection to the insider transfers.

128. Complete disallowance would therefore eliminate even the documented out-of-pocket loss without an evidentiary hearing concerning Hughes's personal involvement.

129. At a minimum, Claimant requests allowance of the portion of the documented $70,000 loss that the evidence establishes belongs to Claimant individually, together with leave to clarify or amend the Claim concerning the remaining portion rather than complete disallowance of Claim No. 26-1.

130. To the extent the Court determines that the $45,000 payment belongs legally to Belle Maison rather than Claimant individually, Claimant requests permission to clarify the claimant identity, document any assignment or individual interest, or otherwise amend the Claim rather than have the entire Claim disallowed.

## VIII. CLAIMANT REQUESTS LEAVE TO CLARIFY OR AMEND RATHER THAN COMPLETE DISALLOWANCE

131. Claimant is appearing without an attorney and has attempted in good faith to describe a complicated series of connected transactions.

132. Claimant's Proof of Claim and this Response concern the same underlying lending transaction, the same payments, the same promised financing, the same failure to fund, and the same resulting injury.

133. Claimant is not attempting to introduce an unrelated transaction or a new factual event.

134. Should the Court determine that Claim No. 26-1 requires further clarification, Claimant requests permission to amend it to:

a. Separate the $70,000 actual payment from the remaining asserted damages;

b. Provide a detailed damages schedule;

c. Identify which damages are asserted by Claimant individually;

d. Clarify the respective interests of Claimant and Belle Maison;

e. Document the source of the funds;

f. Provide additional bank records and loan documents as directed by the Court or for use at an evidentiary hearing;

g. Further identify the particular conduct attributed to Hughes;

h. Identify by page number the relevant portions of the Examiner's Report previously submitted in this case;

i. Provide separately marked copies of the relevant Genie–Zoomeral records for use at an evidentiary hearing or as otherwise directed by the Court;

j. Document personal debts incurred in reliance upon the promised financing;

k. Clarify that the $3 million amount represents asserted damages and not money physically transferred to Hughes or Genie; and

l. Confirm the method by which any recovery from another party will be credited to prevent double recovery.

135. If the Court determines that any portion of the asserted loss belongs to Belle Maison rather than Claimant individually, Claimant requests permission to narrow or amend Claim No. 26-1 to conform to her documented individual interest, without prejudice to any rights belonging separately to Belle Maison.

136. If the Court determines that a different procedure is necessary to adjudicate any portion of Claimant's fraud-based allegations, Claimant requests permission to pursue the appropriate procedure without complete disallowance of the documented underlying debt.

137. Claimant respectfully submits that allowing clarification and setting an evidentiary hearing would be more appropriate than eliminating the entire Claim without considering the supporting evidence.

138. Claimant has not attached duplicate copies of every document referenced in this Response because the Examiner's Report and certain supporting materials were previously submitted in this case. Claimant has retained the underlying agreements, payment records, correspondence, bank records, and related supporting materials and is prepared to provide properly identified copies at an evidentiary hearing, in accordance with any scheduling or prehearing order, or at such other time as the Court may direct.

## IX. REQUEST FOR RELIEF

WHEREFORE, Claimant Lea Muse respectfully requests that the Court:

A. Overrule the Trustee's request to disallow Claim No. 26-1 in its entirety;

B. Determine that Claimant has presented a sufficient factual basis to examine whether Hughes bears personal responsibility for Claimant's loss;

C. Determine, after an evidentiary hearing, whether Claimant has an allowable claim against Hughes based upon Hughes's own knowledge, participation, authorization, concealment, control, receipt of benefits, and involvement in the conduct and transactions described herein;

D. Make such factual findings concerning Hughes's personal knowledge, participation, authorization, concealment, control, and receipt of benefits as are necessary to determine the validity and amount of Claim No. 26-1;

E. Determine that the Trustee's dischargeability concern does not support complete disallowance of Claim No. 26-1 because the Court has denied Hughes a discharge in the present bankruptcy case;

F. Allow Claim No. 26-1 in the amount established by the evidence;

G. Alternatively, allow the portion of the documented $70,000 loss that the evidence establishes belongs to Claimant individually and permit Claimant to clarify or amend the Claim concerning the remaining portion rather than disallowing Claim No. 26-1 in its entirety;

H. Permit Claimant to submit a detailed damages schedule and supporting declaration concerning the amount above $70,000;

I. Set an evidentiary hearing concerning Hughes's ownership, management, knowledge, participation, authorization, control, concealment, benefit, and involvement in the transfers between Genie and Zoomeral;

J. Permit Claimant to amend Claim No. 26-1 to clarify the claimant's identity, the components of the Claim, the supporting documents, and the particular conduct attributed to Hughes;

K. Provide that any amount actually recovered from another estate or responsible party for the same injury shall be credited against the Claim so that Claimant does not receive a double recovery; and

L. Grant such other relief as the Court determines to be fair and appropriate.

Respectfully submitted,

Signature: _____
LEA MUSE, PRO SE
1133 E 83rd St.
Chicago, IL 60619
818-261-8583
lea.bellerealty@gmail.com
Date: July 29, 2026

11

## CERTIFICATE OF SERVICE

I certify that on July 29, 2026, I served a true and correct copy of the foregoing document by email upon the following persons at the email addresses listed below:

**Allison Walsh on behalf of IH Mississippi Valley Credit Union:**
aew@brookslawfirmpc.com

**Dana N. O'Brien on behalf of LendSure Mortgage Corp:**
dana.obrien@mccalla.com; mccallaecf@ecf.courtdrive.com

**Kinnera Bhoopal on behalf of LendSure Mortgage Corp:**
kinnera.bhoopal@mccalla.com; mccallaecf@ecf.courtdrive.com

**Thomas H. Wilson on behalf of MIMS-IPR LLC and Mitchell Mims:**
thw@heplerbroom.com

**Gregory D. Latham on behalf of Michelle Seiler Tucker:** glatham@iplawconsulting.com

**United States Trustee:** USTPRegion10.PE.ECF@usdoj.gov; james.salina@usdoj.gov

I further certify that on July 29, 2026, I served a true and correct copy of the foregoing document by United States Mail, first-class postage prepaid, upon the following:

**Robert E. Eggmann, Chapter 7 Trustee**
P.O. Box 168
Columbia, Illinois 62236

**David Choate Hughes II**
3309 Robbins Rd., PMB 160
Springfield, IL 62704

Date: July 29, 2026

Signature: _____
Lea Muse

12