**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

FILED TIME PM12:35
2026 AUG 31 SPR
ADRIENNE D. ATKINS
CLERK, USBC CDIL

| | | |
|---|---|---|
| IN RE: | ) | In Proceedings |
| | ) | Under Chapter 7 |
| DAVID CHOATE HUGHES II | ) | |
| | ) | BK 25-70566 |
| Debtor. | ) | |

# LEA MUSE'S RESPONSE TO DEBTOR DAVID CHOATE HUGHES II'S INDEPENDENT AND SUPPLEMENTAL OBJECTION TO CLAIM NO. 26-1 (DOC. 625)

Creditor **Lea Muse ("Claimant")**, appearing **pro se**, respectfully responds to Debtor David Choate Hughes II's Independent and Supplemental Objection to Claim No. 26-1 (Doc. 625), and states as follows:

## SUMMARY OF CLAIMANT'S RESPONSE

This dispute should not be reduced to one question: whether David Hughes personally signed Claimant's loan agreement.

Claimant is **not** arguing that Hughes is personally responsible simply because he owned 50% of Genie Investments NV, Inc.

Claimant's position is that the evidence raises serious factual questions about **what Hughes personally knew, authorized, directed, participated in, received, or benefited from** while Genie collected money from business owners for financing that was <u>never provided</u>.

The main points are:

1. Claimant incorporates by reference the **Examiner's Report** from the Genie Investments NV bankruptcy case **# 3:24-bk-00496** (in which David Hughes was 50% owner) and supporting materials previously submitted with Claim No. 26-1 and Claimant's prior response to the Trustee's objection, and refers to those materials only as relevant to Hughes's alleged personal knowledge, conduct, participation, and benefit.

2. **Claimant paid $70,000 and received no financing.** Claimant paid $25,000 personally and $45,000 in prepaid interest through Belle Maison Realty, LLC in connection with a contemplated $3 million financing transaction. The financing was never funded.

3. **Claimant was not the only borrower who was not funded.** The related Genie bankruptcy presently contains 68 creditor claims. Separately, the Court-appointed Examiner reported that, according to Hughes and Cohan themselves, none of Genie's customers had loans funded through the purported Lender Capital Partners because no such funding source ever came to fruition.

4. **For illustration only**, if the contemplated financing associated with those claims averaged approximately $3 million per borrower, that would represent approximately **$204 million** in contemplated financing. Claimant does not contend that this calculation establishes the actual aggregate amount of the 68 creditors' proposed loans.

5. Claimant is not asserting that every creditor had an identical $3 million loan. The point is that Genie was operating a lending program involving very substantial represented financing obligations, while the Examiner reported that, according to Hughes and Cohan themselves, no Lender Capital Partner ever came to fruition to fund Genie's customers. The record therefore raises a serious question as to what actual funding capacity Genie possessed while it continued accepting borrower funds.

6. To Claimant's knowledge, Genie has not produced evidence demonstrating that it possessed, controlled, or had committed access to funding sufficient to support the volume of financing it represented to borrowers.

7. **The words "non-refundable" should not end the Court's inquiry.** Claimant paid money in connection with financing that was never provided. The Court should examine the circumstances surrounding the collection and use of those funds rather than treating the words "non-refundable" as a complete defense.

8. **The Debtor cannot convert disputed conduct into a legitimate transaction merely by pointing to a "non-refundable" clause.**

9. **The handling of borrower funds matters.** The Examiner found instances where one borrower's termination refund was funded with another borrower's ICA deposit.

10. There are **facts** connecting **Hughes** personally to the financial activity that deserve further examination. Hughes held an 82.5% ownership interest in Zoomeral, an entity involved in connecting borrowers with Genie. The Examiner identified approximately **$2.3 million** in transfers from Genie to Zoomeral.

11. Evidence previously submitted by Claimant also identifies Genie's original characterization of approximately **$1.9 million** as "Loan/Compensation to David Hughes as Director."

12. **Claimant is not seeking double recovery.** Any recovery for the same loss from the Genie bankruptcy will be credited against any recovery for those same damages from Hughes or another responsible party.

13. The **$70,000** out-of-pocket loss should be considered separately from the additional **$3 million claim**. If the Court requires additional proof concerning the $3 million component, Claimant asks for the opportunity to provide it rather than having the entire Claim disallowed.

14. **Hughes asks the Court to disallow the entire Claim while also opposing discovery into his own involvement.** If the Court believes more evidence concerning Hughes's personal conduct is needed, Claimant asks for limited discovery and/or an evidentiary hearing before the Claim is completely disallowed.

---

## I. CLAIMANT IS NOT TRYING TO HOLD HUGHES LIABLE SIMPLY BECAUSE HE OWNED GENIE

1. Hughes repeatedly argues that he did not personally sign Claimant's financing agreement, personally guarantee the financing, or personally promise to repay Claimant.

2. Claimant does not dispute that there is no personal guaranty signed by Hughes.

3. But that is not the entire basis of Claimant's Claim.

4. Claimant does **not** argue that Hughes is responsible for every Genie debt merely because he owned 50% of the company.

5. Claimant's position is that Hughes may be responsible for **his own conduct** connected with Genie's lending operation and the handling of borrower funds.

6. During the relevant period, Hughes and John Michael Cohan each owned 50% of Genie.

7. The Court-appointed Examiner reported that Genie was engaged in a lending business offering small-business owners low-interest, non-recourse financing known as a Business Expansion Line of Credit ("BELOC").

8. More importantly, the Examiner reported that, according to **Hughes and Cohan themselves, none of Genie's customers received loans funded by the supposed Lender Capital Partners because no Lender Capital Partner ever came to fruition.**

9. This raises legitimate questions about what Hughes personally knew about Genie's ability to provide financing while Genie continued accepting money from borrowers.

10. The Court should therefore consider what Hughes personally **knew, authorized, directed, participated in, received, or benefited from**, rather than ending the inquiry simply because he did not sign Claimant's agreement personally.

---

## II. CLAIMANT PAID $70,000 FOR FINANCING THAT WAS NEVER PROVIDED

11. There is no dispute that Claimant's transaction involved real money.

12. Claimant paid a total of **$70,000** in connection with the contemplated financing:

    a. **$25,000** paid personally by Lea Muse; and

    b. **$45,000** paid through Belle Maison Realty, LLC as prepaid interest.

13. Genie's banking records support the receipt of these payments.

14. Claimant and Belle Maison never received the contemplated $3 million financing.

15. Claimant did not receive the loan and later change her mind or walk away from a completed financing transaction.

16. Claimant paid the money required of her in anticipation of receiving financing.

17. The financing was never provided.

18. This is important because Hughes now relies heavily on contractual language stating that certain payments were "non-refundable."

---

## III. "NON-REFUNDABLE" DOES NOT ANSWER WHAT HAPPENED HERE

19. Claimant does not deny that the agreements contain "non-refundable" language.

20. Claimant's understanding when entering the transaction was that the required fees and prepaid interest were being paid **as part of a legitimate financing transaction that would proceed toward funding after the required conditions were satisfied.**

21. That did not happen.

22. No loan was funded to Claimant or Belle Maison.

23. The $45,000 payment represented **prepaid interest for financing that was never provided.**

24. Therefore, the issue is not simply whether the words "non-refundable" appear in an agreement.

25. The Court should also consider the circumstances under which the money was collected, why the financing was never provided, and what happened to borrower funds after Genie received them.

26. **The Debtor cannot convert disputed conduct into a legitimate transaction merely by pointing to a "non-refundable" clause.**

27. Claimant respectfully submits that a "non-refundable" provision should not automatically defeat allegations involving fraudulent inducement, concealment, unjust enrichment, misuse of funds, or other wrongful conduct without examining the facts surrounding the transaction.

---

## IV. THIS WAS NOT AN ISOLATED FAILURE TO FUND

28. The related Genie Investments NV bankruptcy, Case No. **3:24-bk-00496-BAJ**, now contains **68 creditor claims**, many involving small-business owners seeking recovery arising from Genie's lending operation.

29. More importantly, the Examiner reported that, according to **Hughes and Cohan themselves, none of Genie's customers had loans funded through the supposed Lender Capital Partners because no Lender Capital Partner ever came to fruition.**

30. Claimant did not cause the represented funding source to fail to materialize.

31. The other borrowers did not cause it either.

32. Yet Hughes now seeks to rely upon "non-refundable" language as though those words alone resolve the losses of borrowers who paid money in connection with financing that was never provided.

33. The Examiner also reported that many McMann customers transferred due-diligence and ICA funds to Genie, their loans were not funded by either McMann or Genie, and those customers did not receive refunds of their due-diligence fees or ICA funds.

34. Genie ultimately filed bankruptcy on **February 21, 2024**, leaving affected creditors to seek recovery through the bankruptcy process.

35. Claimant respectfully submits that these circumstances cannot fairly be reduced to the simple statement that borrowers agreed to "non-refundable" fees.

---

## V. WHAT HAPPENED TO THE BORROWER FUNDS IS RELEVANT

36. The Court-appointed Examiner reviewed Genie's financial records, bank accounts, brokerage records, agreements, testimony, and transactions involving related entities.

37. According to Genie's QuickBooks, Genie collected customer funds for **ICA reserves, due-diligence fees, and bridge interest.**

38. The Examiner also found instances where **one borrower's termination refund was funded using another borrower's ICA deposit.**

39. That finding is important.

40. It shows why the Court should examine how borrower money was handled rather than treating every payment as an ordinary non-refundable fee from an ordinary lending transaction.

41. Claimant's $45,000 was prepaid interest associated with financing that was never funded.

42. Claimant is **not** claiming at this time that her exact $45,000 has been traced dollar-for-dollar into a particular later transfer.

43. Claimant is saying that the Examiner's findings concerning the handling of borrower money justify further examination into what happened to the funds and what Hughes personally knew or did.

---

## VI. HUGHES'S CONNECTION TO GENIE AND ZOOMERAL DESERVES FURTHER EXAMINATION

44. Hughes argues that Genie, Zoomeral, and Hughes personally are separate and that activity involving the companies does not establish his personal liability.

45. Claimant agrees that ownership alone does not automatically make Hughes personally responsible.

46. But ownership is not the only evidence at issue.

47. The Examiner identified Zoomeral as an entity owned by **Hughes and Cohan** that was involved in connecting borrowers with Genie.

48. Claimant's previously submitted evidence also identifies substantial transfers from Genie to Zoomeral.

49. Genie's own original filing reportedly characterized approximately **$1.9 million** transferred to Zoomeral as:

**"Loan/Compensation to David Hughes as Director."**

50. Genie later changed that characterization.

51. Claimant is not asking the Court to treat that statement, by itself, as proof that Hughes owes Claimant money.

52. Claimant is asking the Court to recognize that evidence such as this deserves examination before Hughes is allowed to completely separate himself from Genie's financial activity and obtain complete disallowance of the Claim.

53. The relevant question remains:

**What did Hughes personally know, authorize, direct, participate in, receive, or benefit from?**

---

## VII. CLAIMANT IS NOT SEEKING DOUBLE RECOVERY

54. Hughes argues that Claim No. 26-1 duplicates Claimant's claim in the Genie bankruptcy.

55. The claims arise from the same underlying financing transaction, but they are asserted against **separate debtors based upon separate potential grounds for liability**.

56. Claimant is not asking to collect the same loss twice.

57. Claimant states clearly:

**CLAIMANT WILL NOT RECEIVE DOUBLE RECOVERY FOR THE SAME LOSS.**

58. Any amount actually recovered from the Genie estate for the same damages will be credited against any recovery of those same damages from Hughes or another responsible party.

59. Seeking recovery from more than one potentially responsible party does not mean Claimant intends to be paid twice for the same injury.

---

## VIII. THE $70,000 OUT-OF-POCKET LOSS AND THE ADDITIONAL $3 MILLION CLAIM SHOULD BE CONSIDERED SEPARATELY

60. Claim No. 26-1 asserts a total claim of **$3,070,000**.

61. There are two different components to the Claim.

62. The first is the **$70,000 actually paid** in connection with the transaction.

63. The additional $3 million is not asserted merely because $3 million appeared as the face amount of the contemplated financing. It is an additional monetary claim arising from Claimant's reliance upon, and alleged financial injury resulting from, a financing transaction represented to provide $3 million in business capital.

64. Claimant entered the transaction, executed the required agreements, paid the required funds, including prepaid interest, and materially acted in reliance upon the represented availability of the financing.

65. Evidence relevant to the additional claim may include the purpose for which the financing was obtained, business plans and transactions dependent upon the financing, obligations undertaken in reliance upon funding, alternative financing opportunities that were lost or foregone, financing costs incurred, and other measurable financial consequences directly resulting from the failure of the represented financing.

66. The financing was never provided. More importantly, the Examiner subsequently reported that, according to Hughes and Cohan themselves, no Lender Capital Partner ever came to fruition to fund Genie customers.

67. Claimant therefore contends that the Court must determine not simply whether a $3 million loan failed to close, but whether Claimant was induced to enter, pay money, and materially rely upon a $3 million financing transaction that could not be delivered as represented, and what damages directly resulted from that reliance.

68. Claimant recognizes that the face amount of the financing does not, by itself, automatically establish $3 million in damages. Claimant must establish the amount of damages caused by the failed transaction through evidence.

69. Claimant therefore requests the opportunity to establish those damages through evidence concerning the contemplated financing, the business purpose for which the $3 million was obtained, the financial opportunities or obligations undertaken

in reliance upon funding, and the losses resulting when the represented financing was not provided.

70. The fact that the precise amount of damages remains disputed is a reason to determine damages from evidence; it is not, by itself, a basis to reduce the Claim automatically to the $70,000 paid before Claimant has been afforded an opportunity to prove the additional loss.

71. Claimant is not asking the Court at this stage to determine that the full $3 million is presently proven and allowable; Claimant asks that the additional claim not be summarily extinguished before she is afforded an opportunity to establish the amount through evidence.

---

## IX. HUGHES SHOULD NOT BE ALLOWED TO ARGUE "NO EVIDENCE" WHILE ALSO BLOCKING DISCOVERY

72. Hughes repeatedly argues that Claimant has not provided enough evidence of his personal involvement.

73. At the same time, Hughes asks the Court to prevent Claimant from conducting discovery concerning that involvement.

74. Claimant respectfully submits that these positions conflict.

75. Hughes should not be allowed to argue that Claimant lacks evidence concerning what he personally did while also preventing Claimant from obtaining relevant evidence concerning what he personally did.

76. Claimant is not asking for unlimited discovery into every aspect of the Genie bankruptcy.

77. If the Court believes additional evidence is necessary, Claimant asks for **limited and targeted discovery** concerning matters such as:

a. Hughes's role in Genie's lending operation;

b. what Hughes knew about whether Lender Capital Partners actually existed or would provide funding;

c. communications concerning Genie's ability to fund borrower loans;

d. his involvement in decisions concerning prepaid interest, ICA funds, and other borrower money;

e. Genie-to-Zoomeral transfers;

f. the "Loan/Compensation to David Hughes as Director" characterization;

g. his knowledge concerning the source and use of Genie customer funds; and

h. any direct or indirect benefit he received from relevant transfers.

78. These questions concern **Hughes personally** and go directly to the argument he has raised against Claimant's Claim.

---

## X. THE RELATED GENIE PROCEEDINGS PROVIDE ADDITIONAL REASON TO DEVELOP THE EVIDENCE

79. The U.S. Trustee in the related Genie bankruptcy has asked the Florida court to maintain filing restrictions applicable to Hughes and Cohan and has stated that their continuing filings disrupted administration to the detriment of small-business creditors. (See doc 648, case #3:24-bk-00496-BAJ, Genie Bankruptcy)

80. Claimant does not offer that history as proof of liability. It is offered only to show why disputed questions concerning Hughes's role should be resolved through evidence rather than merely accepting his characterization of events.

---

## XI. HUGHES SHOULD NOT BE PERMITTED TO SHIFT THE FOCUS BACK ONTO THE VICTIMS

81. Claimant respectfully submits that Hughes's objection attempts to shift attention away from the conduct underlying Genie's failed lending operation and place the burden back upon the business owners who lost money in those transactions.

82. The Genie bankruptcy now contains **68 creditor claims**, many involving small-business owners seeking recovery arising from Genie's lending activities.

83. According to the Examiner, **Hughes and Cohan themselves acknowledged that none of Genie's customers received loans funded through the supposed Lender Capital Partners because no Lender Capital Partner ever came to fruition.**

84. Claimant did not cause that failure.

85. The borrowers did not cause that failure.

86. Yet Hughes now asks the Court to focus on the words "non-refundable" while distancing himself from the circumstances surrounding the failure of the lending operation.

87. Claimant respectfully submits that this has the practical effect of **re-victimizing Lea Muse, Belle Maison Realty, LLC, and the other affected business owners** by forcing them to repeatedly defend the legitimacy of their losses while Hughes seeks to distance himself from the lending operation in which he held a substantial ownership and management role.

88. Hughes should not be permitted to use a "non-refundable" clause as a blanket answer while avoiding examination of his own alleged knowledge, participation, control, authorization, transfers, and benefit.

89. The focus should instead be on the evidence showing what Hughes personally:

**knew, authorized, directed, participated in, concealed, received, or benefited from.**

90. Claimant is not asking the Court to decide this matter based upon anger, accusation, or Hughes's character.

91. Claimant asks the Court to decide it based upon the **evidence**.

---

## XII. CLAIMANT IS ASKING FOR AN OPPORTUNITY TO PROVE HER CLAIM

92. Claimant recognizes the difference between an allegation and an established fact.

93. Claimant is not asking this Court to find Hughes liable simply because Genie failed, because Hughes owned 50% of Genie, or because allegations have been made against him.

94. Claimant is asking the Court **not to completely disallow her Claim before the relevant evidence concerning Hughes's own conduct has been considered.**

95. The Examiner's findings, Genie's banking records, the Zoomeral transactions, Genie's own disclosures, and Hughes's role in Genie raise factual questions that deserve examination.

96. Claimant respectfully asks that those questions not be resolved solely by Hughes denying personal responsibility.

---

## XIII. REQUEST TO LIMIT NON-REQUIRED DIRECT COMMUNICATIONS

97. Claimant respectfully advises the Court that she has become increasingly uncomfortable receiving direct litigation-related communications from David Hughes (and John Michael Cohan) outside of formal court channels.

98. This concern is not based simply upon the existence of litigation between the parties. On **August 22, 2026**, Claimant received by **U.S. Mail** a litigation-related discovery package from John Michael Cohan. The envelope prominently displayed postage depicting boxer Muhammad Ali. **Exhibit B**

99. Claimant does not represent to this Court that the image, standing alone, proves that Cohan intended to threaten or intimidate her. However, the mailing did not occur in isolation. **It was received in the context of Cohan's prior accusations** concerning Claimant's coordination and communications with other Genie creditors and his broad discovery requests seeking information concerning other creditors, their identities, communications, persons encouraging legal action or public statements, social-media activity, and individuals critical of Cohan or Genie.

100. In that context, Claimant personally experienced the mailing and its presentation as intimidating and threatening and felt that she was being **singled** out because of her participation as a creditor.

101. Claimant is also concerned that communications of this nature may have a chilling effect upon creditors who have a lawful right to communicate with one another, file claims, provide information, participate in bankruptcy proceedings, and protect their individual interests.

102. Claimant raises this issue not as evidence that Hughes is liable on Claim No. 26-1, but to explain why Claimant requests that Hughes refrain from non-required direct personal communications with her concerning this dispute and why Claimant prefers that related litigation communications occur through formal channels.

103. Claimant respectfully requests that future communications concerning Claim No. 26-1, the Genie bankruptcy, discovery, objections, or related litigation matters be made through formal court filings, counsel where applicable, or other authorized litigation channels.

104. Claimant is not asking the Court to interfere with lawful service of pleadings, discovery, notices, subpoenas, or any other communication required by the Federal Rules, Bankruptcy Rules, or an Order of the Court. Claimant asks only that non-required direct personal communications be avoided.

## XIV. REQUEST FOR RELIEF

WHEREFORE, Claimant **Lea Muse**, appearing pro se, respectfully asks the Court to:

**A.** Deny David Hughes's request to completely disallow Claim No. 26-1 on the current record;

**B.** Decline to find that the absence of a personal guaranty, by itself, eliminates every possible basis for Hughes's personal liability arising from his own alleged conduct;

**C.** In the alternative, if the Court is not presently prepared to allow or determine the additional $3 million component, decline to disallow the independently documented $70,000 out-of-pocket component solely because the additional amount remains disputed;

**D.** Allow Claimant, if necessary, to provide a more detailed calculation and supporting evidence concerning damages above $70,000;

**E.** Allow **limited and targeted discovery and/or an evidentiary hearing** concerning Hughes's own knowledge, participation, authorization, control, transfers, and alleged personal benefit if the Court determines additional evidence is necessary;

**F.** Recognize that Claimant does **not seek double recovery** and will credit any amount actually recovered for the same loss from another responsible party or bankruptcy estate;

**G. Decline to treat the words "non-refundable," standing alone, as a complete answer to Claimant's allegations concerning the circumstances under which the funds were obtained, retained, used, or transferred; and**

**H.** Grant any other relief the Court finds fair and appropriate; and

**I.** Request that Hughes refrain from non-required direct personal communications with Claimant concerning Claim No. 26-1 and related litigation, without restricting any service, notice, discovery, or communication required by applicable rules or Court order.

Respectfully submitted,

**/s/ Lea Muse**
Lea Muse, Individually

Creditor, Pro Se
Claim No. 26-1
Owner of Belle Maison Realty, LLC

# Exhibit A

---

230. According to my review of the Debtor's books and records, significant transfers occurred between the Debtor and related companies within two years and one year of the filing of the bankruptcy petition as shown in the table below

| (Payee) / Payor | 1-Year Period Net Amount | 2-Year Period Net Amount |
|---|---|---|
| Zoomeral Inc | $ (534,381) | $ (1,771,556) |
| Genie Investments II | (736,606) | (736,606) |
| Capitulum LLC | (77,784) | (517,410) |
| Cald Holdings LLC | (77,784) | (517,109) |
| Better Methods | (30,000) | (130,000) |
| Genies Angels | (25,000) | (25,000) |
| **TOTAL** | **$ (1,481,556)** | **$ (3,697,681)** |

---

Chart below details #230

| (Payee) / Payor | 1-Year Period Net Amount | 2-Year Period Net Amount | Total | Owner |
|---|---|---|---|---|
| Zoomeral | $ 534,381 | $ 1,771,556 | **$ 2,305,937** | **Hughes** owns 82.5% and Cohan owns 17.5% |
| Genie Investments II | $ 736,606 | $ 736,606 | **$ 1,473,212** | **owned 50% by Hughes** and 50% by Cohan |
| Capitulum LLC | $ 77,784 | $ 517,410 | **$ 595,194** | Capitulum is owned solely by Cohan |
| Cald Holdings LLC | $ 77,784 | $ 517,109 | **$ 594,893** | Caleb Davis |
| Better Methods | $ 30,000 | $ 130,000 | **$ 160,000** | Better Methods is owned **50% by Hughes** and 50% by Cohan. |
| Genie's Angels | $ 25,000 | $ 25,000 | **$ 50,000** | **Hughes** and/or Cohan |
| Total | **$ 1,481,555** | **$ 3,697,681** | **$ 5,179,236** | |

# Exhibit B



John Michael Cohan
General Delivery
5455 Verna Blvd.
Jacksonville, Florida 32236

Belle Maison Realty LLC

## CERTIFICATE OF SERVICE

I certify that on August 27, 2026, I served a true and correct copy of the foregoing Lea Muse's Response to Debtor David Choate Hughes II's Independent and Supplemental Objection to Claim No. 26-1 (Doc. 625) upon the parties entitled to notice by US Mail.

Robert E. Eggmann, Chapter 7 Trustee
PO Box 168
Columbia, Illinois 62236

David Choate Hughes II
3309 Robbins Rd
PMB 160
Springfield IL 62704

/s/ Lea Muse
Lea Muse